1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        SOUTHERN DIVISION

11  FEDERAL TRADE COMMISSION,    )     SA CV 99-1266 AHS(EEx)
                                 )
12                  Plaintiff,   )
                                 )
13            v.                 )     FINDINGS OF FACT AND
                                 )     CONCLUSIONS OF LAW IN SUPPORT
14  DATA MEDICAL CAPITAL, INC.,  )     OF PRELIMINARY INJUNCTION
    et al.,                      )     ISSUED JUNE 22, 2009
15                               )
                                 )
16                  Defendants   )
    _____)

17

18                       TABLE OF CONTENTS

19  FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . 1

20  I.      The Case and the Parties. . . . . . . . . . . . . . 2

21          A.   Background . . . . . . . . . . . . . . . . . . 2

22          B.   Contempt Defendants . . . . . . . . . . . . . 3

23               1.   Defendant D'Antonio . . . . . . . . . . . 3

24               2.   Contempt Defendant RLG. . . . . . . . . . 4

25               3.   Contempt Defendant ALG. . . . . . . . . . 5

26               4.   Contempt Defendant Financial Group  . . . . 6

27  II.     Contempt Defendants' Business Practices . . . . . . . 7

28          A.   Telemarketing . . . . . . . . . . . . . . . . 7

B.   Material Misrepresentations . . . . . . . . . . 8

   1.   They Would Stop Foreclosures . . . . . . . 9

   2.   They Would Modify Consumers' Mortgages . . 9

   3.   Highly Qualified Attorneys Would Prevent Foreclosures and Would Negotiate Modified Mortgages . . . . . . . . . . . . . . . . 10

   4.   They Conducted "Forensic" Analyses of Consumers' Mortgages . . . . . . . . . . 11

   5.   Contempt Defendants Provided Limited Disclaimers Only After Making Misrepresentations . . . . . . . . . . . 12

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . 13

I.   The Court's Authority to Grant Preliminary Injunction and Other Relief . . . . . . . . . . . . . . . . 13

  A.   Jurisdiction . . . . . . . . . . . . . . . . 13

  B.   Legal Standard . . . . . . . . . . . . . . . 13

II.  The FTC is Likely to Succeed on the Merits. . . . . 13

  A.   Legal Standard for Civil Contempt . . . . . 13

  B.   The FTC is Likely to Prove by Clear and Convincing Evidence That the Permanent Injunction Applies to Contempt Defendants . . . . . . . . . . . . 14

   1.   Defendant D'Antonio . . . . . . . . . . 14

   2.   Contempt Defendant RLG . . . . . . . . 14

   3.   Contempt Defendant ALG . . . . . . . . 15

   4.   Contempt Defendant Financial Group . . . 16

  C.   The FTC is Likely to Prove by Clear and Convincing Evidence That Contempt Defendants Violated a Definite and Specific Court Order . . . . . . 16

1.   *The Permanent Injunction is a Definite and*
     *Specific Court Order*  . . . . . . . . . .  16

2.   *The FTC is Likely to Prove by Clear and*
     *Convincing Evidence That Contempt Defendants*
     *Violated the Permanent Injunction* . . . .  18

3.   *Contempt Defendants' Disclaimers Did Not*
     *Change the Net Impression of the*
     *Misrepresentations*  . . . . . . . . . . .  20

4.   *The Equities Weigh in Favor of Granting*
     *Injunctive Relief* . . . . . . . . . . . .  20

**INTRODUCTION**

The Court has considered the proposed Findings of Fact submitted by plaintiff FTC, lodged on June 29, 2009, and the objections thereto submitted by defendant Bryan D'Antonio on July 6, 2009, and by Rodis Law Group, Inc., on the same day, in connection with the June 22, 2009 Preliminary Injunction hearing. The evidence, briefs, and arguments before the Court include:

- Exhibits 1-15 to the FTC's Memorandum in Support of the FTC's Application for a Temporary Restraining Order and Preliminary Injunction (Docs. 95, 96, 97);[1]

- Opposition of America's Law Group ("ALG") to plaintiff's application for preliminary injunction (Doc. 112);

- Opposition of Rodis Law Group ("RLG") to plaintiff's application for preliminary injunction (Doc. 120);

- The Report of Temporary Receiver's Activities for the Period of May 27, 2009 through June 12, 2009 filed with the Court on June 16, 2009 (Doc. 119);

- The declarations of Nicholas Chavarela, Nhahanh Nguyen, and Holly Johnson that were attached as Attachments A-C to the FTC's June 18, 2009 Reply to Rodis Law Group Inc.'s and America's Law Group's Opposition to Plaintiff's Application for a Preliminary Injunction (Doc. 122);

---

[1] The citations to documents, exhibits, and other submitted materials made herein refer to document numbers and page numbers assigned to the respective documents as reflected in the docket.

1 • The First Amended Objection of ALG to plaintiff's reply

2 (Doc. 131);

3 • The deposition transcripts and exhibits attached

4 thereto from the depositions of Bryan D'Antonio (Doc.

5 127), Ronald P. Rodis (Doc. 126), and Nicholas

6 Chavarela (Doc. 128) that were lodged with the Court on

7 June 19, 2009;

8 • All other materials filed or lodged in support or

9 opposition in this matter; and

10 • The arguments made by the parties at the June 22, 2009

11 hearing.

12 Upon consideration of the foregoing, the Court makes

13 the following findings of fact and conclusions of law in support

14 of the preliminary injunction requested by Plaintiff Federal

15 Trade Commission.

16 **<u>FINDINGS OF FACT</u>**

17 **I.      The Case and the Parties**.

18 A.   <u>Background</u>

19 1.   Plaintiff Federal Trade Commission ("FTC" or

20 "Commission") is a federal law enforcement agency which enforces

21 section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibiting

22 unfair or deceptive acts or practices in or affecting commerce.

23 2.   The FTC filed the complaint in this action on

24 October 14, 1999, against Bryan D'Antonio ("D'Antonio") and

25 entities he controlled (Doc. 1) and sought an *ex parte* TRO with

26 an asset freeze that the Court granted on October 18, 1999 (Doc.

27 10).

28 3.   D'Antonio agreed to the Stipulated Final Judgment

and Order for Permanent Injunction ("2001 Permanent Injunction")
that this Court entered on July 13, 2001.  (Doc. 74.)

4.   The 2001 Permanent Injunction, *inter alia,*
permanently banned D'Antonio, and those acting in concert with
him, from:  (1) telemarketing or assisting others engaged in
telemarketing; and (2) misrepresenting any material facts related
to a consumer's decision to buy or accept a good or service.
(Id.)

5.   On May 27, 2009, the FTC filed an *Ex Parte*
Application for a Temporary Restraining Order and a Preliminary
Injunction, Pending Decision on Its *Ex Parte* Application for An
Order to Show Cause Why Contempt Defendants Should Not Be Held in
Contempt ("TRO Application").  (Doc. 83.)

6.   On May 27, 2009, the Court issued a Temporary
Restraining Order[2] with an asset freeze and appointment of a
Temporary Receiver.  (Doc. 85.)

7.   On June 22, 2009, the Court conducted the
Preliminary Injunction hearing and, upon finding good cause,
issued the requested Preliminary Injunction, including a
continued asset freeze and receivership, and set the Contempt
Hearing for July 28, 2009.  (Doc. 136).  On June 24, 2009, the
Court granted and denied in part D'Antonio's Ex-Parte Application
for a release of funds and ordered a release of $100,000 to the
law firm of Stephens Friedland LLP from funds that the FTC froze
for it to be applied to legal services for D'Antonio.

---

[2]   The TRO was served on Contempt Defendants on May 28,
2009.  (See Doc. 110.)

B.    Contempt Defendants.

8.    The Contempt Defendants in this action:

a.    D'Antonio;

b.    RLG;

c.    ALG; and

d.    The Financial Group, Inc. ("Financial Group").

(Referred to collectively as "Contempt Defendants.")

1.    *Defendant D'Antonio.*

9.    D'Antonio provided the FTC with a sworn statement acknowledging receipt of the 2001 Permanent Injunction on July 23, 2001.  (Doc. 95, Ex. 2).

10.    D'Antonio controlled the business operations of RLG, ALG, and Financial Group, set basic marketing and operational policies and philosophies, and served as the final senior officer to resolve problems with clients.  (Doc. 119 at 5-6.)[3]

2.    *Contempt Defendant RLG.*

11.    RLG is a California professional corporation located at 1100 Town and Country Road, Orange, California. (Lewis Decl., Doc. 96, Ex. 15 at p. 370, ¶ 42.)

---

[3]   The Receiver's Report was not consecutively paginated throughout.  For consistency of reference, pages referred to herein are the page numbers assigned to the filed PDF document, Docket 119.

1       12.   Ronald P. Rodis[4] ("Rodis") incorporated RLG on

2   October 15, 2008.  (Doc. 96, Ex. 15, Att. A at p. 375.)

3       13.   D'Antonio recruited Rodis to be associated with

4   his foreclosure prevention and loan modification operations.

5   (Doc. 119 at 5.)

6       14.   D'Antonio set up the "operational framework" for

7   RLG.  (Doc. 119, p. 5.)

8       15.   Financial Group, controlled by D'Antonio,

9   recruited, hired, and trained sales personnel and legal support

10  personnel servicing RLG.  (Id.; Doc. 120, RLG Opp'n, Ex. C.)

11      16.   D'Antonio identified himself as CEO and Senior

12  Managing Director of RLG.  (Dyssegard Decl., Doc. 95, Ex. 4, Att.

13  C at p. 60-61; Hawkins Decl., Doc. 95, Ex. 11 at p. 106, ¶ 6;

14  Doc. 119 at p. 68.)

15      17.   D'Antonio gave employees orders, threatened to

16  fire employees who did not perform to his expectations, had

17  signature authority over RLG bank accounts and had authority over

18  transfers of RLG funds to other accounts, including to Financial

19  Group accounts, and made policy and operational decisions

20  regarding the customers that RLG would accept.  (Akins Decl.,

21  Doc. 95, Ex. 7 at p. 73, ¶¶ 3, 4, 6; Mai Decl.,  Doc. 95, Ex. 8

22  at p. 82, ¶ 4; Rudder Decl. Doc. 95, Ex. 9 at p. 88, ¶¶ 4-5; J.

23  Smith Decl. Doc. 95, Ex. 10 at p. 97, ¶ 4; Hawkins Decl.  Doc.

24  95, Ex. 11 at p. 105-06, 111, ¶¶ 3, 6, 8-12, 38; McCullar Decl.,

25

26      [4]   At his June 12, 2009 deposition, Rodis invoked his
   Fifth Amendment privilege as to questions concerning:  (a) the
27  operations of RLG; (b) the representations RLG made in sales
   scripts, telephone sales calls, radio ads, and web sites; and (c)
28  RLG's foreclosure prevention and loan modification services.

Doc. 95, Ex. 6 at p. 70, ¶¶ 8-9; Nguyen Decl., Doc. 122-3 ¶¶ 9, 23, 26; Signature Cards, Doc. 97, Ex. 15, ¶¶ 27-30, Atts. CC & DD; Doc. 119 p. 5.)

18.   Although RLG was incorporated in Rodis' name, Rodis was a figurehead who did not manage RLG, and who was, at best, minimally involved in providing any services to consumers. (Doc. 95, Ex. 7 at p. 69-70 ¶¶ 3, 9, 10; Doc. 95, Ex. 8 at p. 82, 85, ¶¶ 4, 28-30; Doc. 95, Ex. 9 at p. 89, 93-94, ¶¶ 10, 38-41; Doc. 122-2 ¶¶ 23-26; see Doc. 119 at p. 74.)

19.   RLG had gross service revenues of approximately $1.1 million in 2008 and $6.2 million in 2009. (Doc. 119 at p. 11.)

### 3.   *Contempt Defendant ALG.*

20.   ALG also is located at 1100 Town and Country Road, Orange, California. (Doc. 96, Ex. 15 at p. 370, ¶ 42.)

21.   D'Antonio recruited Nicholas Chavarela ("Chavarela") to be associated with his foreclosure prevention and loan modification operations. (Doc. 119 at p. 74.)

22.   Chavarela[5] incorporated The Law Offices of Nicholas Chavarela, Inc. on April 1, 2009, and filed a fictitious business name statement on April 9, 2009, indicating he would conduct business as ALG. (Id. at p. 4.)

23.   ALG was a continuation of D'Antonio's foreclosure prevention and loan modification operation. (Id. at pp. 4-5, 74-

---

[5]   The FTC noticed the deposition of Chavarela to commence June 12, 2009. (Doc. 128-2.) Chavarela did not remain to respond to questions but submitted instead a declaration stating that he would assert his Fifth Amendment privilege as to all questions and then left the deposition.

77.)

24.   D'Antonio set up the "operational framework" for ALG, and Financial Group, controlled by D'Antonio, funded ALG's start up and recruited, hired, and trained sales and legal support personnel for ALG.  (Doc. 119 at p. 5.)

25.   On Friday, April 10, 2009, D'Antonio and another RLG senior manager, Wayne Farris (also C. Wayne Farris or Charles Wayne Farris), announced ALG's formation to staff and said that, effective the next day, April 11, 2009, RLG would no longer accept new customers and all new loan modification customers would be ALG customers.  Any customers who had become RLG customers prior to and through April 11, 2009, continued to be RLG customers.  (Doc. 95, Ex. 6 at p. 70 ¶ 12.)

26.   D'Antonio and the rest of the company management remained the same.  (Id. at p. 70-71 ¶¶ 15-16, 19.)

27.   D'Antonio continued to be in charge at ALG, he maintained control over the foreclosure prevention and loan modification operation.  (Id. ¶ 15.)

28.   D'Antonio identified himself as Senior Managing Director for ALG to ALG staff (Doc. 119 at p. 30) and identified himself as an ALG Director in a sworn financial statement, stating that he earned $128,000 "year-to-date."  (D'Antonio Decl., Doc. 116 at p. 6).

29.   D'Antonio also controlled the ALG funds. D'Antonio – not Chavarela – was a signatory on the bank accounts of The Law Offices of Nicholas Chavarela, Inc. (Doc. 119 at p. 7) and D'Antonio's approval was required for refunds to ALG customers (id. at p. 16).

30.   ALG had gross service revenues of approximately $986,000 in 2009.  (Id. at p. 13.)

4.   *Contempt Defendant Financial Group.*

31.   Financial Group also is located at 1100 Town and Country Road, Orange, California.  (Doc. 96, Ex. 15 at 370 ¶ 42.)

32.   D'Antonio is a signatory on multiple Financial Group bank accounts.  (Doc. 96, Ex. 15 at p. 364 ¶ 28; Doc. 97, Ex. 15, Att. CC at p. 772.)

33.   D'Antonio identified himself as the Owner, President, and Chief Executive Officer ("CEO") of Financial Group to U.S. Bank, a bank used by Financial Group.  (Doc. 96, Ex. 15 at p. 365 ¶ 30; Doc. 97, Ex. 15, Att. CC at p. 791-92, 803.)

34.   D'Antonio controlled the Financial Group and all of the activities it performed in conjunction with RLG and ALG. (Doc. 119 at p. 5.)

35.   D'Antonio approved transfers of funds from ALG accounts to Financial Group accounts.  (Doc. 119 at p. 30-31.)

36.   RLG employees were paid from a Financial Group bank account, issued by "The Financial Group, Inc. dba Tax Relief ASAP."  (Doc. 96, Ex. 15 at p. 365, ¶ 31; Doc. 97, Ex. 15, Att. II at p. 824-912; Doc. 95, Ex. 6 at p. 70, ¶ 7.)

37.   Charges for RLG's services appeared on customers' accounts as both Financial Group and Tax Relief ASAP.  (Brand Decl., Doc. 95, Ex. 12 at p. 113-14 ¶ 9.)

38.   Funds were transferred between RLG and Financial Group on multiple occasions.  (Doc. 96, Ex. 15 at p. 366, ¶ 32; Doc. 97, Ex. 15, Att. GG.)

39.   RLG, ALG, and Financial Group shared human

resources, accounting, and information technology staff.  (Doc. 95, Ex. 6 at p. 71, ¶ 17; Ex. 11 at p. 105, ¶ 4; Doc. 119 at 5.)

**II.        Contempt Defendants' Business Practices.**

A.    <u>Telemarketing.</u>

40.  Contempt Defendants' foreclosure rescue and loan modification operation relied upon a nationwide radio campaign in conjunction with web sites to generate thousands of telephone calls from consumers.  (Doc. 96, Ex. 15 at p. 359, ¶ 14.)

41.  When consumers called the advertised numbers, they reached telemarketers at RLG or ALG, who made various representations regarding Contempt Defendants' services.  (Doc. 95, Ex. 12 at p. 113, ¶ 2; Ex. 13 at p. 117, ¶¶ 2-3; Doc. 96, Ex. 15 at p. 355-56, ¶¶ 4, 7.)

42.  The radio advertisements, web sites, and telemarketers' pitches induced consumers to purchase Contempt Defendants' services.  (Doc. 95, Ex. 12 at p. 113-14 ¶¶ 7-9; Ex. 13 at p. 118,  ¶¶ 5-6.)

B.    <u>Material Misrepresentations.</u>

43.  From October 2008 to mid-April 2009, D'Antonio marketed his purported mortgage rescue services through RLG. (<u>See</u> Doc. 95, Ex. 6 at p. 70, ¶ 12.)

44.  RLG telemarketers were trained to "capitalize on fear," "create urgency," and "sell hope."  (Obrey Decl., Doc. 95, Ex. 5 at p. 63-64, ¶ 4.)

45.  On or about April 10, 2009, D'Antonio announced ALG's formation and told the staff that RLG would no longer accept new customers and that all new loan modification customers would be ALG customers.  (Doc. 96, Ex. 6 at p. 70, ¶12.)

46.  ALG's and RLG's web sites were virtually identical, sharing the same 800-number for consumers to call for free consultations.  (Doc. 96, Ex. 15 at p. 362-63, ¶ 22; compare Doc. 97, Ex 15, Att. V *with* Doc. 97, Ex. 15, Att. Y.)  Even an RLG consumer testimonial from "Randy E." thanking RLG for saving his home and reducing his principal balance was recycled into a testimonial for ALG.  (Doc. 96, Ex. 15 at p. 362-63, ¶¶ 23-25; Doc. 97, Ex. 15, Atts. Z, AA, and BB.)

47.  ALG's radio advertisements are very similar to RLG's, encouraging consumers to hire ALG's experienced lawyers and "Put the power of America's Law Group on your side and keep your home."  (Doc. 96, Ex. 15 at p. 358-59, ¶ 13, Att. J at p. 477:14-15, Att. K at p. 481:13-15.)

48.  RLG's and ALG's scripts and marketing materials were almost identical.  (Doc. 119 at p. 8-9.)

          1.  *Contempt Defendants Misrepresented That They Would Stop Foreclosures.*

49.  Contempt Defendants represented that they would stop foreclosures and save consumers' homes.  They made these representations in radio advertisements, on their web sites, and in telemarketing calls and written communications with consumers. (Doc. 95, Ex. 4 at p. 49-51, ¶¶ 4, 7, 9, Ex. 5 at p. 64-65 ¶¶, 6-8, Ex. 12 at p. 113, ¶ 4, Ex. 13 at p. 117, ¶ 4; Doc. 96, Ex. 15 at p. 358-59, ¶¶ 13, 15, Att. I at p. 473:7-8, 14-16, Att. J at p. 477:14-15, Att. K at p. 481:13-15, Att. L at p.  499:15-16, Att. O at p. 569:11-12; Doc. 97, Att. U, Att. V at p. 737-38.)

50.  Contempt Defendants told consumers they had never lost a home to foreclosure.  (See, e.g., Doc. 96, Ex. 15, Att. O

at p. 556:23-25, 557:1-4; Doc. 27, Att. U at p. 729:22-25, 730:1-7; Doc. 95, Ex. 5 at p. 64-65 ¶¶ 7-8.)

51.  Notwithstanding the promises to stop foreclosures, between ten and thirty consumers' homes were foreclosed on between November 2008 and February 2009.  (Doc. 95, Ex. 7 at p. 77, ¶ 30, Ex. 8 at p. 84, ¶ 21, Ex. 9 at p. 92, ¶ 27, Ex. 12 at p. 114-15, ¶ 14, Ex. 13 at p. 118, ¶¶ 7, 10.)

52.  Moreover, as many as fifty RLG customers had foreclosure sales scheduled after they became clients.  (Doc. 95, Ex. 8 at p. 85, ¶ 27, Ex. 10 at p. 102, ¶ 29.)

>               2.   *Contempt Defendants Misrepresented That They*
>                    *Would Modify Consumers' Mortgages.*

53.  Contempt Defendants represented that they would "rewrite" and modify mortgages by negotiating substantially lower interest rates, lower and more affordable monthly payments, and reduced principal balances.  Contempt Defendants told consumers they routinely obtained these results and had a 100% success rate in obtaining loan modifications.  (Doc. 95, Ex. 4 at p. 50-51, ¶¶ 6-7, 9, Att. B at p. 57, Ex. 12 at p. 113, ¶ 7; Doc. 96, Ex. 15 at p. 356-57, ¶ 8, Att. G at p. 421:22-23, 431:7-8, Att. H at p. 457:8-10, Att. J at p. 477:9-13, Att. L at p. 497:6-10, Att. M at p. 515:2-11, Att. N at p. 537:20-25, 540:2-6, Att. O at p. 557:13-21, Att. Q at p. 620:17-20; Doc. 97, Ex. 15, Att. S at p. 672:9-10, Att. T at p. 704: 22-25; Doc. 119 at p. 9.)

54.  However, Contempt Defendants did not deliver on their promises to modify mortgage loans.  The Temporary Receiver found that the completed loan modifications and loan modifications in progress were "meager" in comparison to Contempt

Defendants' representations.  (Doc. 119 at p. 6, 8-9.)

55.  Contempt Defendants completed only eight loan modifications for more than 2,000 clients – or about .37% (3/8ths of 1 per cent) of the total clients.  About 99 percent (99%) of the clients did not receive the promised interest-rate reductions, reduced payments, or a principal balance reduction.  (<u>Id.</u> at p. 6.)

3.  *Contempt Defendants Misrepresented That Highly Qualified Attorneys Would Prevent Foreclosures and Negotiate Modified Mortgages.*

56.  Contempt Defendants told consumers that experienced attorneys would aggressively negotiate on their behalf.  In radio advertisements, web sites, e-mails, and telemarketing calls, Contempt Defendants told consumers they had multiple attorneys with foreclosure prevention and mortgage loan modification expertise.  (Doc. 95, Ex. 4, Att. B at p. 56; Doc. 96, Ex. 15, Att. I at p. 473:7-12, Att. M at p. 512:17-19, Att. N at p. 537:20-25, Att. O at p. 550:19-24, Att. P at p. 581:14-18; Doc. 97, Ex. 15, Att. R at p. 648:12-16, 653:7-10, Att. S at p. 675:18-23, Att. U at p. 728:22-23, Att. V at p. 737-738, Att. QQ at p. 935.)

57.  Contempt Defendants did not employ the promised "team" or "staff" of experienced real estate attorneys purportedly working aggressively on customers' behalf.  Rodis was the only lawyer whose involvement with RLG spanned the entire October 2008 to mid-April 2009 period that RLG was in operation.  (Doc. 95, Ex. 7 at p. 75, ¶ 17; Ex. 8 at p. 83, ¶ 11; Ex. 9 at p.

90, ¶ 15.)  He had no involvement with the vast majority of customer files.  For the limited number of customer files Rodis worked on, his involvement was often reluctant, amounted primarily to assuaging irate customers, and only occasionally involved discussions with lenders.  (Doc. 95, Ex. 7 at p. 79, ¶ 44; Ex. 8 at p. 85, ¶¶ 28-30; Ex. 9 at p. 93-94, ¶¶ 38-40; Ex. 10 at p. 102, ¶¶ 31-32.)

58.  Other attorneys at times – usually for a short span of time – worked on RLG customer files, but they lacked the promised experience.  (Doc. 97, Ex. 15, Att. PP at p. 933; Doc. 95, Ex. 7 at p. 75-76, ¶¶ 18, 20, Ex. 8 at p. 83, ¶¶ 12-13, Ex. 9 at p. 90, ¶ 17, Ex. 10 at p. 98, ¶¶ 13-14; Doc. 122-3 ¶¶ 2-3.)

59.  The non-attorney staff did not have foreclosure prevention or loan modification experience, and Contempt Defendants did not provide instruction or training in preventing foreclosures or obtaining loan modifications.  (See Doc. 95, Ex. 7 at p. 77-78, ¶¶ 34, 37, Ex. 8 at p. 84-85, ¶¶ 23-24, 28, Ex. 9 at p. 91-92, ¶¶ 19, 29-30, Ex. 10 at p. 99-100, ¶ 22, Ex. 11 at p. 110, ¶ 31; Doc. 122-3 ¶¶ 16-18; Doc. 119 at p. 5-6.)

4.  *Contempt Defendants Misrepresented That They Conducted "Forensic" Analyses of Consumers' Mortgages.*

60.  Contempt Defendants told consumers they would conduct forensic analyses of their mortgages to use as leverage in negotiations with lenders.  (Doc. 119 at 9.)  The web sites and telemarketers claimed that experienced real estate attorneys would carefully review and analyze consumers' mortgages for legal violations that Contempt Defendants could leverage in

negotiations with lenders.  (Doc. 95, Ex. 5 at p. 65, ¶ 9, Ex. 12 at p. 113, ¶ 8; Doc. 96, Ex. 15, Att. M at p. 516:20-25, 517:4-7; Doc. 97, Att. V at p. 738.)

61.  The web sites highlighted Contempt Defendants' promises to conduct a customized forensic review of each consumer's case:

> There simply is not one right solution for everyone, and no one can tell you what is right for you without thoroughly analyzing your legal rights, financial situation and a **forensic audit** of your loan documents.  We understand the mortgage industry from years of experience and will use leverage to negotiate to benefit you.

(Doc. 97, Ex. 15, Att. V at p. 738, Att. W at p. 746.) (Emphasis added.)

62.  Contempt Defendants admitted they did not conduct a single "forensic analysis" of a customer's mortgage loan documents.  (Doc. 119 at p. 10.)

63.  Both Rodis and Chavarela stated that any such audit "would need to be outsourced," but no evidence shows that Contempt Defendants outsourced such audits.  (Id.)

> 5.  *Contempt Defendants Provided Limited Disclaimers Only After Making Misrepresentations*

64.  In late January 2009, RLG instructed its telemarketers to add a "no guarantee" disclaimer at the end of the sales pitch.  (Doc. 95, Ex. 5 at p. 65-66, ¶ 14; Doc. 97, Ex.

15 ¶ 40, Att. KK at p. 917.)  To the extent RLG may have provided the disclaimer to consumers, telemarketers were instructed to do so only *after* they concluded their aggressive sales pitch, including the misrepresentations.  (See Doc. 95, Ex. 4 at p. 51-21, ¶ 10, Ex. 5 at p. 65-66, ¶ 14.)

65.  ALG submitted a copy of a retainer agreement for consideration prior to the preliminary injunction hearing.  (Doc. 131.)  The agreement includes a "no guarantee-scheduling" provision at the end of three pages of legalese addressing such topics as arbitration, referral fees, jurisdiction, and severability.  (Doc. 131, Att. C.)  The agreement disclaims any representations regarding success or outcome (Doc. 131, Att. C at p. 19), but was sent to consumers only *after* telemarketers completed the aggressive sales pitch that contained numerous promises about results.  (Doc. 122-4, Att. C ¶¶ 4-6.)

## CONCLUSIONS OF LAW

**I.     The Court's Authority to Grant the Preliminary Injunction and Other Relief.**

A.   Jurisdiction.

66.  This Court has jurisdiction over this matter for all purposes, as specifically reserved in Section XV ("Continued Jurisdiction") of the Permanent Injunction.  (Doc. 74.)

B.   Legal Standard.

67.  The Court may grant the FTC's request for a preliminary injunction upon a showing of a likelihood of success on the merits and where the equities weigh in favor of granting preliminary relief.  FTC v. Affordable Media, LLC, 179 F.3d 1228, 1233 (9th Cir. 1999).  The FTC, unlike private litigants, need

1  not show irreparable harm.  Id.; see also FTC v. Vocational

2  Guides, Inc., No. 3:01-0170, 2008 WL 4908769, at *1 (M.D. Tenn.

3  Nov. 12, 2008) (applying standard in FTC contempt proceeding).

4  **II.      The FTC is Likely to Succeed on the Merits and**

5            **Establish Civil Contempt by the Contempt Defendants.**

6            A.   Legal Standard for Civil Contempt.

7            68.   The Court has the inherent power to enforce its

8  Permanent Injunction through civil contempt.  Shillitani v.

9  United States, 384 U.S. 364, 370, 86 S. Ct. 1531, 1535, 16 L. Ed.

10 2d 622 (1966).  As a party to the original action, the FTC may

11 invoke the court's power by initiating a proceeding for civil

12 contempt.  Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444-

13 45, 31 S. Ct. 492, 55 L. Ed. 797 (1911).

14           69.   Civil contempt is established by clear and

15 convincing evidence that a party knew of and violated a specific

16 and definite order of the court.  Affordable Media, 179 F.3d at

17 1239.

18           70.   Third parties, such as RLG, ALG, and Financial

19 Group, are subject to an injunctive order when they are "in

20 active concert or participation with [a party]" and "receive

21 actual notice of [the order] by personal service or otherwise."

22 Fed. R. Civ. P. 65(d)(2).

23           B.   The FTC is Likely to Prove by Clear and Convincing

24                Evidence That the Permanent Injunction Applies to

25                Contempt Defendants.

26           71.   The FTC is likely to prove by clear and convincing

27 evidence that the Permanent Injunction applies to all of the

28 Contempt Defendants.

1                        1.  *Defendant D'Antonio.*

2          72.  The Permanent Injunction binds D'Antonio because

3    he was a party to the original litigation in this matter and

4    signed an affidavit declaring that he received that order.  Fed.

5    R. Civ. P. 65(d).

6                        2.  *Contempt Defendant RLG.*

7          73.  The Permanent Injunction binds Contempt Defendant

8    RLG because it had actual notice of the Permanent Injunction and

9    acted in concert or participation with D'Antonio.  Fed. R. Civ.

10   P. 65(d).

11         74.  RLG received actual notice of the Permanent

12   Injunction through D'Antonio.

13         75.  The knowledge of a company's officer and manager

14   is imputed to the company.  Cal. Civ. Code § 2332; People v.

15   Forest E. Olson, Inc., 137 Cal. App. 3d 137, 140, 186 Cal. Rptr.

16   804, 806-07 (Cal. Ct. App. 1982).  Substantial evidence supports

17   the conclusion that D'Antonio was an officer and manager of RLG.

18   D'Antonio identified himself as CEO and Senior Manager of RLG in

19   corporate documents and in written and verbal communications to

20   employees, and demonstrated control of RLG by directing

21   allocation of company funds, exercising hiring and firing

22   authority, dictating company sales strategy, and making other

23   operational decisions.[6]

24

25         [6]  Because D'Antonio, Rodis, and Chavarela invoked
26   their Fifth Amendment privilege against self-incrimination in
     response to all deposition questions and to sitting for
27   deposition in the case of Chavarela, the Court may draw adverse
     inferences from their failure of proof.  See SEC v. Gemstar-TV
28   Guide Int'l, Inc., 401 F.3d 1031, 1046 (9th Cir. 2005).

76.   RLG acted in concert with D'Antonio.  RLG was the entity through which D'Antonio engaged in telemarketing and made misrepresentations about RLG's foreclosure and loan modification services from October 2008 through mid-April 2009.

3.   *Contempt Defendant ALG.*

77.   The 2001 Permanent Injunction binds ALG because it had actual notice of the 2001 Permanent Injunction and acted in concert or participation with D'Antonio.  Fed. R. Civ. P. 65(d).

78.   ALG received actual notice of the Permanent Injunction through D'Antonio.

79.   D'Antonio also identified himself as CEO and Senior Manager of ALG in corporate documents and in written and verbal communications to employees, and demonstrated control of ALG by providing the initial financing of the company, subsequently directing allocation of company funds, exercising hiring and firing authority, dictating company sales strategy, and making other operational decisions.

80.   ALG acted in concert with D'Antonio.  ALG was the entity through which D'Antonio continued engaging in telemarketing and making misrepresentations about foreclosure and loan modification services, from mid-April 2009 until May 28, 2009, when Contempt Defendants were served with the TRO.

4.   *Contempt Defendant Financial Group.*

81.   The 2001 Permanent Injunction binds Financial Group because it had actual notice of the 2001 Permanent Injunction and acted in concert or participation with D'Antonio. Fed. R. Civ. P. 65(d).

82.   Financial Group received actual notice of the 2001

Permanent Injunction through D'Antonio, who was an officer and manager of that company.

83.   The evidence establishes that D'Antonio identified himself as the Owner, President, CEO, and a senior manager of Financial Group in corporate documents, and written and verbal communications.

84.   Financial Group acted in active concert and participation with D'Antonio.  Financial Group shared human resources, accounting, and information technology staff with ALG and RLG, and D'Antonio was a signatory on bank accounts for all three Contempt Defendants.  Financial Group was integrally involved with the management and allocation of funds between the entities, as well as with the mortgage rescue operations.

85.   The evidence shows that the FTC is likely to prove by clear and convincing evidence that Contempt Defendants were bound by the 2001 Permanent Injunction.

C.   <u>The FTC is Likely to Prove by Clear and Convincing Evidence That Contempt Defendants Violated a Definite and Specific Court Order.</u>

1.   *The Permanent Injunction is a Definite and Specific Court Order.*

86.   The relevant provisions of the Permanent Injunction – the telemarketing definition (in "Definitions"), Section I ("Permanent Ban") and Section II ("Prohibited Representations") are definite and specific.

87.   Section I.B. of the Permanent Injunction bans D'Antonio, and those in active concert with him, from:

engaging in, or receiving any remuneration of

1         any kind whatsoever from, holding any

2         ownership interest, share, or stock in, or

3         serving as an officer, director, trustee,

4         general manager of, or consultant or advisor

5         to, any business entity engaged, or assisting

6         others engaged in any of these activities, in

7         whole or in part, in . . . [t]elemarketing or

8         assisting others engaged in telemarketing.

9 (Doc. 74 at 5-6.)

10     88.   The Permanent Injunction clearly defines the term

11 "telemarketing" as "a plan, program or campaign which is

12 conducted to induce the purchase of goods or services by the use

13 of one or more telephones and which involves more than one

14 interstate telephone call." (Id. at 4.)

15     89.   Section II of the Permanent Injunction prohibits

16 D'Antonio, and those in active concert with him, from

17 misrepresenting, "in connection with the advertising, marketing,

18 promoting, telemarketing, offering for sale, or sale of any good

19 or service, . . . any fact material to a consumer's decision to

20 buy or accept the good or service." (Id. at 7-8.)

21     90.   The Permanent Injunction provides "fair and well-

22 defined notice" that telemarketing and making material

23 misrepresentations are prohibited.  See Reno Air Racing Ass'n,

24 Inc. v. McCord, 452 F.3d 1126, 1132 (9th Cir. 2006).  It likewise

25 provides definite and specific explanations of the prohibited

26 conduct.

27     91.   Thus, the Permanent Injunction is a definite and

28 specific Court order.

2.   *The FTC is Likely to Prove by Clear and*
*Convincing Evidence That Contempt Defendants*
*Violated the Permanent Injunction.*

92.   Substantial evidence demonstrates that Contempt Defendants violated the Permanent Injunction's telemarketing ban. Contempt Defendants' operations were based on a concerted telemarketing "campaign." Contempt Defendants D'Antonio, RLG, and ALG devoted significant resources to their nationwide radio advertising, which, along with their web sites, directed consumers to call a toll-free telephone number. Thereafter, these Contempt Defendants' telemarketers fielded thousands of consumer calls and aggressively made false promises of lower interest rates and affordable monthly payments. Financial Group provided logistical support for the telemarketing operations. Therefore, there is a substantial likelihood that the FTC will prove by clear and convincing evidence that Contempt Defendants violated the Permanent Injunction by acting in concert and participating in telemarketing.

93.   Substantial evidence demonstrates that Contempt Defendants violated the Permanent Injunction's ban against making material misrepresentations. Contempt Defendants D'Antonio, RLG, and ALG made numerous material misrepresentations in marketing and selling foreclosure prevention and mortgage loan modification services. D'Antonio used RLG and ALG to falsely promise consumers that: 1) they would not lose their homes; 2) they would receive modifications with lower interest rates and affordable monthly payments; and 3) highly experienced attorneys would fight for them in ways that included conducting "forensic

audits" that would compel lenders to offer affordable mortgage terms.

94.   RLG and ALG consistently represented that they had multiple attorneys with foreclosure prevention and loan modification expertise, had never lost a home to foreclosure, and had a 100% success rate.  RLG and ALG also told consumers that they routinely obtained, *inter alia*, lower interest rates, lower monthly payments, and reduced principal balances.  The content of RLG's and ALG's web sites, radio advertisements, and sales scripts and other marketing materials were virtually identical, and telemarketers for both entities made the same representations.  When RLG stopped accepting new clients, its telemarketers became telemarketers of the foreclosure and loan modification services under ALG's name.  RLG and ALG each represented that they would conduct forensic audits and aggressively negotiate on consumers' behalf.

95.   It appears that a number of Contempt Defendants' customers lost their homes to foreclosure.  It is estimated that as many as fifty RLG customers had foreclosure sales scheduled after they became clients.  Together, the Contempt Defendants had over 2,000 clients from November 2008 through mid-April 2009 – they obtained loan modifications for eight (8) of them, or about .37% (3/8ths of 1 per cent).  About 99 percent (99%) of the clients did not receive the promised interest-rate reductions, a reduced monthly payment, a forgiveness or postponement of delinquent payments, or a principal balance reduction.  Similarly, Contempt Defendants did not employ the number of attorneys promised, or attorneys with the promised

qualifications.   Neither RLG nor ALG conducted forensic audits,
pursued legal action against lenders, or, in most instances,
negotiated with lenders' legal departments.

96.   The evidence set forth in former employee and
consumer witness declarations, and the Temporary Receiver's
Report supports the conclusion that the FTC is likely to prove,
by clear and convincing evidence, that Contempt Defendants
violated the 2001 Permanent Injunction's prohibition against
making material misrepresentations about any good or service.

3.   *Contempt Defendants' Disclaimers Did Not*
*Change the Net Impression of the*
*Misrepresentations.*

97.   Contempt Defendants' verbal and written
disclaimers were provided only after telemarketers had ample
opportunity to lure consumers with misrepresentations of success,
and false promises to halt foreclosures, and negotiate lower
interest rates, monthly payments, and reduced principal balances.
(Id. ¶¶ 65-66.)   The false promises overshadowed the disclaimers;
consequently the disclaimers did not alter the "net impression"
conveyed by Contempt Defendants' misrepresentations.   See FTC v.
Cyberspace.com, LLC, 453 F.3d 1196, 1200 (9th Cir. 2006) ("net
impression" representation misleading even if it also contains
truthful disclosures); FTC v. Medlab, Inc., 615 F. Supp. 2d 1068,
at *7-8 (N.D. Cal. April 21, 2009) (parties cannot "inoculate
themselves" from net impression with cautionary statements).

4.   *The Equities Weigh in Favor of Granting*
*Injunctive Relief.*

98.   "[T]he standards of the public interest, not the

23

1   requirements of private litigation, measure the propriety and
2   need for injunctive relief. . . ." Hecht Co. v. Bowles, 321 U.S.
3   321, 331, 64 S. Ct. 587, 592, 88 L. Ed. 754 (1944); see 15 U.S.C.
4   § 53(b).  When balancing the equities between the parties, the
5   public equities must be given greater weight.  Affordable Media,
6   179 F.3d at 1236.  In an FTC action, harm to the public interest
7   in the absence of an injunction is presumed.  See id. at 1233.

8         99.  Granting the requested injunctive relief serves
9   the public interest by upholding the Court's Permanent
10  Injunction, preserving assets and the Court's ability to order
11  meaningful relief, preventing evidence destruction, and
12  protecting consumers.  Against these public benefits, Contempt
13  Defendants have no legitimate interest in continuing their
14  deceptive and contumacious conduct unabated, dissipating their
15  assets, or destroying evidence.  See Commodity Futures Trading
16  Comm'n v. British Am. Commodity Options Corp., 560 F.2d 135, 143
17  (2d Cir. 1977); FTC v. Sage Seminars, Inc., No. C 95-2854 SBA,
18  1995 WL 798938, at *8 (N.D. Cal. Nov. 2, 1995).

19        100. The Court concludes that, in light of the evidence
20  that Contempt Defendants engaged in deceptive conduct that
21  violated the Permanent Injunction by making misrepresentations to
22  financially distressed consumers about their experience and the
23  promised results of their foreclosure and loan modification
24  services, the equities weigh in the FTC's favor.

25        101. Because the 2001 Permanent Injunction is a
26  definite and specific order and the FTC is likely to prove by
27  clear and convincing evidence that Contempt Defendants violated
28  the 2001 Permanent Injunction, and because the equities weigh in

1  favor of granting the requested injunctive relief, the Court

2  concludes that the Preliminary Injunction is appropriate and

3  necessary.

4          The Clerk shall serve these Findings of Fact and

5  Conclusions of Law on all counsel of record to the instant

6  proceedings.

7          Dated:   July 13, 2009.

8

ALICEMARIE H. STOTLER

9  _____

10          ALICEMARIE H. STOTLER
         UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28