UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | SA CV 99-1266 AHS (EEx) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER ADJUDICATING CONTEMPT |
| | ) | DEFENDANTS IN CONTEMPT OF |
| DATA MEDICAL CAPITAL, INC., | ) | COURT AND FINDINGS OF FACT |
| et al. | ) | AND CONCLUSIONS OF LAW IN |
| | ) | SUPPORT THEREOF; ORDER FOR |
| | ) | PHASE II PROCEEDINGS |
| Defendants. | ) | |

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . 3

I.   The Case and the Parties. . . . . . . . . . . . . . . 3
     A.   Federal Trade Commission and Prior Proceedings. . . . 3
     B.   Contempt Citees. . . . . . . . . . . . . . . . . . 5
          1.   Contempt Defendant D'Antonio. . . . . . . . . 5
          2.   Contempt Defendant RLG. . . . . . . . . . . . 9
          3.   Contempt Defendant ALG. . . . . . . . . . . . 12
          4.   Contempt Defendant TFG . . . . . . . . . . . . 16

II.  Contempt Defendants' Business Practices. . . . . . . . . 17
     A.   Telemarketing. . . . . . . . . . . . . . . . . . . 17
     B.   Material Misrepresentations. . . . . . . . . . . . 19
          1.   Contempt Defendants Misrepresented That They
               Would Stop Foreclosures. . . . . . . . . . . 20
          2.   Contempt Defendants Misrepresented That They
               Would Modify Consumers' Mortgages. . . . . . 21
          3.   Contempt Defendants Misrepresented That Highly
               Qualified Attorneys Would Prevent Foreclosures
               and Negotiate Modified Mortgages. . . . . . . 26
          4.   Contempt Defendants Misrepresented That They
               Conducted "Forensic" Analyses of Consumers'
               Mortgages. . . . . . . . . . . . . . . . . . 33
          5.   Contempt Defendants Changed Policies and
               Practices After They Learned of the FTC's
               Investigation. . . . . . . . . . . . . . . . 35
               a.   Contempt Defendants introduced disclaimers
                    and terminated a group of recent telemarketer
                    hires after they learned of the FTC's
                    investigation. . . . . . . . . . . . . 35
               b.   Contempt Defendants implemented other
                    operational changes after the FTC and other
                    federal and state law enforcement agencies
                    announced a crackdown on mortgage relief
                    fraud. . . . . . . . . . . . . . . . . 37

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . 38

I.   The Court Has Inherent Power to Enforce the Permanent
     Injunction through Civil Contempt . . . . . . . . . . . 38
     A.   Jurisdiction. . . . . . . . . . . . . . . . . . . 38
     B.   Legal Standard for Civil Contempt. . . . . . . . . 39
     C.   The Permanent Injunction Applies to Contempt
          Defendants. . . . . . . . . . . . . . . . . . . . 40
          1.   Contempt Defendant D'Antonio Is Bound by the
               Permanent Injunction. . . . . . . . . . . . 40
          2.   Contempt Defendant RLG Is Bound by the Permanent
               Injunction. . . . . . . . . . . . . . . . . 40
          3.   Contempt Defendant ALG Is Bound by the Permanent
               Injunction. . . . . . . . . . . . . . . . . 43

4.   *Contempt Defendant TFG Is Bound by the Permanent Injunction.* . . . . . . . . . . . . . . 44
5.   *Corporate Contempt Defendant TFG Was an Alter Ego of D'Antonio, and Therefore Is Bound by the Permanent Injunction* . . . . . . . . . . . . . 45
6.   *Corporate Contempt Defendants Are Bound by the Permanent Injunction as a Common Enterprise.* . 47

II.  Contempt Defendants Violated a Definite and Specific Court Order. . . . . . . . . . . . . . . . . . . . . . . . 48
     A.   The Permanent Injunction Is Definite and Specific . 48
          1.   *The Telemarketing Ban Is Definite and Specific.* 48
          2.   *The Prohibition on Misrepresenting Material Facts Is Clear and Definite.* . . . . . . . 53
     B.   The FTC Established by Clear and Convincing Evidence That Contempt Defendants Violated the Permanent Injunction's Prohibition Against Telemarketing. . . 53
     C.   The FTC Has Established by Clear and Convincing Evidence That Contempt Defendants Violated the Permanent Injunction's Prohibition Against Making Material Misrepresentations. . . . . . . . . . . 54
          1.   *Contempt Defendants Misrepresented the Nature of the Services Provided, Their History of Success, and the High Likelihood That Contempt Defendants Would Negotiate a Substantially Reduced Mortgage Payment.* . . . . . . . . . . . . . . . . . . 55
          2.   *Contempt Defendants' Misrepresentations Were Material.* . . . . . . . . . . . . . . . . . . 58
          3.   *Contempt Defendants' Disclaimers Did Not Change the Net Impression of the Misrepresentations* . 58
          4.   *Evidentiary Objections are Overruled in Part and Sustained in Part.* . . . . . . . . . . . . . 59
     D.   The Contempt Defendants Did Not Substantially Comply with the Permanent Injunction. . . . . . . . . . 61

III. Contempt Defendants Face Sanctions to be Determined . . 64

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . 64

# I.

## **INTRODUCTION**

The Court read and considered all materials submitted in connection with the November 18, 2009 civil contempt hearing, including:

- The FTC's *Ex Parte* Application for Order to Show Cause Why Contempt Defendants Should Not be Held in Contempt (Doc. 91); Memorandum of Points and Authorities in Support of that Application (Doc. 92); and *Ex Parte* Application to Modify Stipulated Final Order; Memorandum in Support (Doc. 94); Contempt Defendants The Rodis Law Group, Inc.'s ("RLG") and Bryan D'Antonio's ("D'Antonio's") oppositions to those applications (Docs. 245, 246, 247); and the FTC's reply briefs (Docs. 271, 272);

- All of the Exhibits submitted by the parties in support of their respective applications and memoranda for or against a finding of civil contempt, including Exhibits 3-30, 32-38, 40-51, 53-65, 68, 76, 84-85, 89-90, 93, 97, 102, 104-109, and 500-501;

- Volumes I-III of Declarations In Support of Federal Trade Commission's *Ex Parte* Applications Seeking Civil Contempt Sanctions and to Modify Stipulated Final Order; Supplemental Declaration of Kenton Johnson (Doc. 275); Supplemental Declaration of Naomi Parnes (Doc. 276); and Declaration of Victor Nguyen (Doc. 277); and all of the related attachments thereto;

- Declarations in support of Opposition of Defendant Bryan D'Antonio to Ex Parte Application for Order to Show Cause

1   Why Contempt Defendants Should Not be Held in Contempt,
2   including J. Gregory Dyer; Victoria Vanransom; Consumers
3   Martin Aiello, Bob Barton, Ted Bernard, Bill Dynek, Paulette
4   Olsen, Deborah Ray, Rebecca Spallino, and William Young;
5   Previous Employees Thi Cao, Dianna Castillo, Maria Del
6   Gallego, Aaron Garcia, Linda Le, Christopher Lekawa,
7   Katherina Nguyen, Jamie Norris, Ralph Osborne, and Nadar
8   Qsar; Second Declaration of Nadar Qsar; and all of the
9   related attachments thereto;

10  • America's Law Group's ("ALG") designated declarations,
11    including the declarations of Jane Marchman and Nadar Qsar;

12  • The FTC's designations of the depositions of Nicholas
13    Chavarela (August 19, 2009); Bryan D'Antonio (June 11,
14    2009); Charles Wayne Farris (August 18, 2009); and Ronald P.
15    Rodis (June 12, 2009);

16  • All of the parties' designations – including initial,
17    counter, supplemental, updated, and reply, as appropriate –
18    of the depositions of David Dyssegard (August 24, 2009);
19    Rick McCullar (August 26 and 28, 2009); Nadar Qsar (October
20    27, 2009); Sarah Rudder (August 27, 2009); Juliette Smith
21    (August 27, 2009); and Thomas Yeager (July 28, 2009);

22  • The Report of Temporary Receiver's Activities for the Period
23    of May 27, 2009 through June 12, 2009, filed with the Court
24    on June 16, 2009 ("Temp. Receiver's Rpt.," Doc. 119), which
25    the Court approved by Order issued on September 25, 2009
26    (Doc. 230);

27  • All other materials filed or lodged in support or opposition
28    in this matter; and;

1    •    The arguments made by the parties at the November 18, 2009
2         hearing.
3              The Court grants judicial notice as requested in
4    D'Antonio's Request for Judicial Notice re Ex Parte Application
5    for Order to Show Cause re:  Why Contempt Defendants Should Not
6    Be Held in Contempt (Doc. 248).
7              After due consideration of the submissions made before
8    and after the hearing, including all proposed findings of fact
9    and conclusions of law and various parties' objections, the Court
10   finds by clear and convincing evidence the following facts which
11   support the Court's conclusion, as set forth in the following
12   Conclusions of Law, that defendant Bryan D'Antonio and all named
13   contempt citees are in contempt of the Court's July 13, 2001
14   Permanent Injunction.

15                              **II.**

16                         **<u>FINDINGS OF FACT</u>**

17   **I.      The Case and the Parties.**

18            A.   <u>Federal Trade Commission and Prior Proceedings.</u>

19            1.   Plaintiff, the Federal Trade Commission ("FTC" or
20   "Commission"), initiated this action on October 14, 1999, by
21   filing a complaint against D'Antonio and entities he controlled
22   (Doc. 1) and seeking an *ex parte* TRO with an asset freeze, which
23   the Court granted on October 18, 1999 (Doc. 10).

24            2.   The Complaint alleged that defendants used general
25   media advertisements to generate inbound telemarketing calls and
26   then made deceptive representations during their telemarketing
27   operation.  (Doc. 1.)

28            3.   D'Antonio agreed to the Stipulated Final Judgment

                                  3

1   and Order for Permanent Injunction ("Permanent Injunction") that

2   the Court entered on July 13, 2001.  (Doc. 74.)

3           4.   The Permanent Injunction, *inter alia,* permanently

4   banned D'Antonio, and "all persons or entities directly or

5   indirectly under [defendants'] control, and all other persons or

6   entities in active concert or participation with them who receive

7   actual notice of this Order by personal service or otherwise, and

8   each such persons, whether acting directly or through any

9   corporation, limited liability company, subsidiary, division, or

10  other device, are hereby permanently restrained and enjoined

11  from:  (1) telemarketing or assisting others engaged in

12  telemarketing" ; and (2) making, or assisting in the making of,

13  expressly or by implication, any false or misleading statement or

14  representation of material fact, including, but not limited to,

15  any misrepresentation about any other fact material to a

16  consumer's decision to purchase any employment program."

17          5.   In a related criminal proceeding, D'Antonio

18  entered a guilty plea to one count of mail fraud in connection

19  with telemarketing and one count of wire fraud in connection with

20  telemarketing in a criminal indictment alleging similar facts.

21  D'Antonio was sentenced to a term of four years in prison

22  followed by three years supervised release for leading that

23  enterprise.  (*U.S. v. D'Antonio*, CR-00158-AHS (C.D. Cal.) J. &

24  Prob./Commitment Order,  March 6, 2003, Ex. 108.)

25          6.   On May 27, 2009, the FTC filed its *Ex Parte*

26  Application for a Temporary Restraining Order and a Preliminary

27  Injunction, Pending Decision on Its *Ex Parte* Application for An

28  Order to Show Cause Why Contempt Defendants Should Not Be Held in

Contempt ("TRO Application").  (Doc. 83.)

7.   On May 27, 2009, this Court issued a Temporary Restraining Order ("TRO") with an asset freeze and appointment of a Temporary Receiver.  (Doc. 85.)   The Contempt Defendants were served with the TRO on May 28, 2009.  (Doc. 110.)

8.   On June 22, 2009, the Court issued the requested Preliminary Injunction, including a continued asset freeze and receivership, and set the contempt hearing for July 28, 2009. (Docs. 136, 140, 172.)  The contempt hearing was subsequently continued to November 18, 2009.

B.   Contempt Citees.

9.   For purposes of this contempt proceeding, the Contempt citees, collectively hereafter referred to as "Contempt Defendants" are:

    a.   Bryan D'Antonio ("D'Antonio");

    b.   The Rodis Law Group, Inc. ("RLG");

    c.   America's Law Group ("ALG"); and

    d.   The Financial Group, Inc. ("TFG").

    1.   *Contempt Defendant D'Antonio.*

10.   D'Antonio provided the FTC with a sworn statement acknowledging receipt of the Permanent Injunction on July 23, 2001.  (Doc. 95, Ex. 2.)

11.   D'Antonio controlled the RLG, ALG, and TFG foreclosure prevention and loan modification operation.  He oversaw and controlled the business operations of RLG, ALG, and TFG, set basic marketing and operational policies and philosophies, and served as the final senior officer to resolve problems with clients.

12.   Wayne Farris (aka C. Wayne Farris and Charles Wayne Farris, hereafter "Farris"), a senior manager for Contempt Defendants, and Rob Hart, a sales manager for Contempt Defendants, informed employees that D'Antonio determined how much money the company spent on advertising and that D'Antonio and others spent extensive time developing advertising scripts (Exs. 63, 64).

13.   D'Antonio oversaw critical financial aspects of the operations, including commission structure and funding of leads (Ex. 15), as well as approval of refunds, particularly refunds involving large amounts (Temp. Receiver's Rpt., Doc. 119 at 16 (the Temporary Receiver's Report is not paginated consecutively throughout; the page numbers referenced herein are the page numbers assigned to the filed document (Doc. 119)) (Ex. 25); Lekawa Decl. ¶¶ 4, 8, Nov. 2, 2009), and approval of advance issuance of employee pay checks (McCullar Dep. 138:13-139:10). D'Antonio also funded the start-up expenses for ALG. (Ex. 27; Temp. Receiver's Rpt., Doc. 119 at 30-31.)

14.   D'Antonio had signature authority for bank accounts for each of the Contempt Defendants (R. Lewis Decl. ¶¶ 27-30, Atts. CC, DD, May 18, 2009; Ex. 13, 14, 34) and directed the entities' Controller, Linda Le (L. Le Decl. ¶ 3, Oct. 30, 2009), to transfer more than one million dollars in corporate funds to his personal accounts (Exs. 23, 27, 57, 28-30; Temp. Receiver's Rpt., Doc. 119 at 7, 14; Supp. Decl. of K. Johnson, Att. B).

15.   D'Antonio influenced operational and other policies in areas ranging from matters involving retainer

6

agreement language (Ex. 56) and how to handle retainer agreements received under the RLG name after the business began using the ALG name (Ex. 57) to employee dress code and office space logistics (Ex. 15).

16.  D'Antonio recruited, first, Ronald P. Rodis ("Rodis"), and then Nicholas Chavarela ("Chavarela"), to be involved with Contempt Defendants' operations.  (Rodis Law Group, Inc.'s Opp. To Pl.'s App. For Contempt Order "RLG Opp.," Doc. 245 Att. C. (Mar. 6, 2009 letter from Rodis to D'Antonio, describing how D'Antonio influenced Rodis' involvement and describing how D'Antonio's management impacted RLG); McCullar Dep. 110:3-111:20, 112:2-13, 114:4-115:2 (D'Antonio and Farris first announced loan modification business pilot program, then offered opportunity for telemarketers to transition from TFG dba Tax Relief ASAP to RLG); Ex. 24; Kane Decl. Att. A; Exs. 21, 24, 53-55 (e-mails establishing D'Antonio's connection to Nick Chavarela, role in recruiting him to replace Rodis, and position of authority in determining whether and how to respond to Chavarela's correspondence.))

17.  D'Antonio expressly held himself out as CEO of Contempt Defendants.  (Dyssegard Dep. 43:10-21, Aug. 25, 2009.) His name, with the title "CEO," appeared on pages of the RLG employee handbook, entitled "Welcome to Rodis Law Group" and "Closing Statement."  (Exs. 10, 11.)  He identified himself as TFG's president and CEO on documents provided to U.S. Bank.  (R. Lewis Decl. ¶ 30, Att. CC at 441, 445, 452.)

18.  D'Antonio conveyed his authority to staff in various meetings by making statements about corporate goals and,

at times, stating that he would fire employees who did not follow his instructions. (McCullar Dep. 62:23-63:8, 110:3-111:8, 112:2-13, 183:23-184:8, 197:8-198:23; J. Smith Dep. 82:6-24, Aug. 27, 2009 ("Bryan basically came out and said that what we are going to be doing is just getting as much – bringing in as much money as possible, files. These people are bottom feeders. They didn't really care about their house and we are going to make as much money as possible."); N. Nguyen Decl. ¶ 7-9; J. Smith Decl. ¶ 4; Rudder Decl. ¶¶ 4-7.) D'Antonio hosted Contempt Defendants' Christmas party at the home he shared with Christi D'Antonio, at which he gave a speech, describing the company as a family-owned company and thanking everyone for "all the hard work" they were doing "for our company." (McCullar Dep. 197:8-10, 198:9-19.)

19. On other occasions, mid-and senior-level managers referred to D'Antonio as the person in charge. (Temp. Receiver's Rpt., Doc. 119 at 6-7; Dyssegard Decl. ¶ 15; McCullar Dep. 183:16-22; 184:18-185:14.) On one such occasion, Farris likened D'Antonio's status to that of Bill Gates at Microsoft, while chastising staff for making "blind transfers" to D'Antonio (transferring callers directly to D'Antonio without announcing them), saying, "Absolutely nobody should be able to call into the floor and then be passed straight on to [D'Antonio]. . . . Can you imagine calling the customer service department of Microsoft and then being transferred straight to Bill Gates? Come on guys, get a clue!" (Kane Decl. ¶ 12, Att. C.)

20. The FTC noticed the depositions of D'Antonio, Rodis, Chavarela, and Farris during the course of these proceedings. Each invoked his Fifth Amendment privilege against

8

self-incrimination as to all questions about D'Antonio's control of and the operations of RLG, ALG, and TFG.  (D'Antonio Dep. 58:8-62:3, 63:10-22, 65: 7-71:7, 71:14-73:8, 83:21-107:19, June 11, 2009; Rodis Dep. 23:13-27:19, 37:3-8, 37:20-22, June 12, 2009; Chavarela Dep. 10:23-11:21; 12:16-20, 13:4-14:16, 15:4-6, 25:18-26:18, 35:24-39:1, Aug. 19, 2009; Farris Dep. 11:13-12:16, 13:5-14:9, 15:8-17:1, 40:14-42:3, 54:18-55:20, 62:5-64:19, 65:11-66:6, 70:19-78:21, 86:20-88:24, Aug. 18, 2009.)

2.   *Contempt Defendant RLG.*

21.   RLG, a California corporation, is located at 1100 Town and Country Road, Orange, Calif.  (R. Lewis Decl. ¶ 42.)

22.   According to the Temporary Receiver's Report, RLG had gross service revenues approximating $1.1 million in 2008 and $6.2 million in 2009.  (Temp. Receiver's Rpt., Doc. 119 at 13.)

23.   Rodis incorporated RLG on October 30, 2008.  (R. Lewis Decl. Att. A.)

24.   The FTC took the deposition of Rodis on June 12, 2009, but he declined to answer questions, invoking his Fifth Amendment privilege against self-incrimination, including but not limited to, questions related to:  (a) the operations of RLG; (b) the representations RLG made in sales scripts, telephone sales calls, radio advertisements, and websites; (c) RLG's foreclosure prevention and loan modification services; and (d) D'Antonio's control of Contempt Defendants' operations.  (Rodis Dep. 23:13-66:22.)

25.   D'Antonio recruited Rodis to be associated with his foreclosure prevention and loan modification operations and set up the "operational framework" for RLG.  (Temp. Receiver's

Rpt., Doc. 119 at 5; K. Johnson Decl. ¶¶ 2-3; Kane Decl. ¶¶ 2-3;
RLG Opp., Doc. 245 Att. C; McCullar Dep. 110:3-111:20, 112:2-13,
114:4-115:2.)

26.   TFG, controlled by D'Antonio, recruited, hired,
and trained sales personnel and legal support personnel servicing
RLG.  (Temp. Receiver's Rpt., Doc. 119 at 5; K. Johnson Decl. ¶¶
2-3; Kane Decl. ¶¶ 2-3.)

27.   D'Antonio used the titles CEO and Senior Managing
Director while at RLG.  (Exs. 10, 11; Dyssegard Decl. Att. C at
60-61; Temp. Receiver's Rpt., Doc. 119 at 18, 74, 77.)

28.   D'Antonio, and not Rodis, controlled RLG's
operations.  On April 1, 2009, RLG filed a Statement of
Information with the California Secretary of State, identifying
Rodis as CEO for the first time.  (RLG Opp. Att. A.)  Prior to
April 1, 2009, D'Antonio was the only CEO identified for RLG.

29.   D'Antonio had signature authority over RLG bank
accounts and had ultimate authority over transfers of RLG funds
to other accounts, including TFG accounts, and made policy and
operational decisions regarding the customers that RLG would
accept.

30.   Employees who worked at RLG between November 2008
and February 2009 testified that Rodis was a figurehead who did
not manage RLG, and who was, at best, minimally involved in
providing any services to consumers.  (N. Nguyen Decl. ¶¶ 23-26,
June 4, 2009; Rudder Decl. ¶¶ 10, 38-41, April 19, 2009.)  In a
January 22, 2009 e-mail, Rodis told D'Antonio that it was
"physically impossible" for him to speak to clients in a timely
manner based on the high volume of clients that D'Antonio was

1   bringing in as compared to the amount of staff hired to provide
2   loan modification services.  (RLG Opp. Ex. B.)

3          31.   In the January 22, 2009 e-mail, Rodis stated that
4   he would no longer take on clients under his name.  (*Id.*)  In a
5   March 6, 2009 letter, Rodis admitted that he knew about the
6   underlying action against D'Antonio, expressed his disappointment
7   that the details had not been disclosed by D'Antonio, and again
8   expressed dissatisfaction with how D'Antonio ran the operation.
9   (RLG Opp. Att. C.)  In an April 6, 2009 e-mail, Rodis related his
10  understanding of the contractual agreements between RLG and TFG,
11  and he outlined D'Antonio's actions to the contrary.  (Temp.
12  Receiver's Rpt., Doc. 119, at 77-78.)  Despite Rodis' requests
13  and complaints, RLG continued to solicit and bring on clients
14  until April 11, 2009.  (McCullar Decl. ¶ 12.)  Rodis did not stop
15  ongoing deceptive solicitations in RLG's name.  Notwithstanding
16  his dissatisfaction with D'Antonio, and although he maintained a
17  law office at another location (Lewis Decl. Att. D), Rodis did
18  continue working with D'Antonio at the RLG/ALG/TFG complex until
19  May 28, 2009, when the Receiver took control of the premises
20  (Temp. Receiver's Rpt., Doc. 119 at 1).

21         32.   Fifteen consumers testified that they rarely or
22  never spoke to Rodis, or spoke to him only after complaining or
23  when facing imminent foreclosure, and did not experience positive
24  results when they did.  (Barrett-Sparrow Decl. ¶¶ 13-23, Sept.
25  18, 2009; Brand Decl. ¶¶ 10, 12-13, April 2, 2009; Caley Decl. ¶¶
26  18-30, Sept. 18, 2009; Castro Decl. ¶¶ 10-25, Sept. 22, 2009;
27  Eddinger Decl. ¶¶ 7-12, April 20, 2009; Hottel Decl. ¶¶ 13-20,
28  Sept. 16, 2009; Linares Decl. ¶¶ 11-24, Sept. 29. 2009; Mitchell

Decl. ¶¶ 6-8, 12-15, Sept. 17, 2009; Peralta Decl. ¶¶ 10-21,
Sept. 25, 2009; Pocasangre Decl. ¶¶ 11-12, November 2, 2009; Reed
Decl. ¶¶ 14-26, Oct. 2, 2009; Reyes Decl. ¶¶ 5-19, Sept. 23,
2009; Rodriguez Decl. ¶¶ 13-28, Sept. 18, 2009; Servin Decl. ¶¶
16-20, 22-28, Sept. 18, 2009; Shusterman Decl. ¶¶ 12-22, Sept.
29, 2009.)  D'Antonio identified five consumers who testified
that Rodis provided assistance.[1]  (Aiello Decl. ¶¶ 6-7, Sept. 16,
2009; Barton Decl. ¶ 6, Aug. 29, 2009; Bernard Decl. ¶¶ 6-7,
Sept. 16, 2009; Dynek Decl. ¶ 5, Sept. 15, 2009; Young Decl. ¶ 7,
Sept. 10, 2009.)[2]  However, testimony that Rodis was in contact
with five consumers does not refute nor overcome the evidence
that Rodis' involvement was minimal.

      33.  Rodis admitted that RLG had not conducted a
forensic audit.  (Kane Decl. ¶ 6; Temp. Receiver's Rpt., Doc. 119
at 10.)

### 3.  *Contempt Defendant ALG.*

      34.  ALG is also located at 1100 Town and Country Road,
Orange, California.  (R. Lewis Decl. ¶ 42.)

      35.  D'Antonio recruited Chavarela to be associated
with his foreclosure prevention and loan modification operations.
(Exs. 21, 24, 53-55; Temp. Receiver's Rpt., Doc. 119 at 5, 74-77;
K. Johnson Decl. ¶¶ 2-3; Kane Decl. ¶¶ 2-3.)

---

[1] RLG also submitted these consumer declarations previously
in connection with RLG's September 18, 2009 Application for an
order requiring the Receiver to permit Rodis to work for these
clients.  (*See* Doc. 219.)

[2] D'Antonio submitted testimony from another consumer,
Deborah Ray, which references work performed by "Ron and his
staff," but does not clearly contain testimony that Ms. Ray ever
worked directly with Rodis.  (Ray Decl. ¶¶ 8-9, Sept. 16, 2009.)

36.   The FTC took the deposition of Chavarela on August 19, 2009.  Chavarela invoked his Fifth Amendment privilege against self-incrimination as to all questions, including but not limited to, questions related to:  (a) the operations of ALG; (b) the representations ALG made in sales scripts, telephone sales calls, radio advertisements, and websites; (c) ALG's foreclosure prevention and loan modification services; and (d) D'Antonio's control of Contempt Defendants' operations.  (Chavarela Dep. 10:23-11:21, 13:4-34:15, 39:3-40:24.)

37.   Chavarela incorporated The Law Offices of Nicholas Chavarela, Inc. on April 1, 2009, and filed a fictitious business name statement on April 9, 2009, indicating he would conduct business as ALG.  (Temp. Receiver's Rpt., Doc. 119 at 4.)

38.   D'Antonio transferred the "operational framework" of RLG to ALG, and TFG, controlled by D'Antonio, funded ALG's start-up and recruited, hired, and trained sales and legal support personnel for the entity.  (Ex. 27; Temp. Receiver's Rpt., Doc. 119 at 30-31.)

39.   On Friday, April 10, 2009, D'Antonio and Farris announced ALG's formation to staff and said that, effective the next day, April 11, 2009, the business would conduct all new sales under the ALG name.  (McCullar Decl. ¶ 12.)  D'Antonio and the rest of the company management remained the same.  (Le Decl. ¶¶ 3; Lekawa Decl. ¶ 4, 8-10; McCullar Decl. ¶¶ 15-16, 19.)

40.   Nader Qsar began working at RLG in March of 2009, and testified he worked for both RLG and ALG.  He did not distinguish between the entities when testifying regarding various topics including the entities' relationships with

1  lenders, legal support department practices, and loan
2  modification results.  (Qsar Dep. 20:16-25, 21:16-22:1, 22:22-
3  24:5, 37:3-25; Qsar Decl. ¶¶ 2, 5-8; Second Qsar Decl. ¶ 4-6.)
4  D'Antonio submitted declarations of a number of former employees
5  who similarly referred to RLG and ALG as a single entity in
6  connection with testimony regarding various matters including
7  operations, sales, refund practices, and management.  (Castillo
8  Decl. ¶ 7; Le Decl. ¶ 8; Lekawa Decl. ¶¶ 4-6, 8-12; Osborne Decl.
9  ¶¶ 4, 6, 10, 14-15.)

10        41.  When identifying attorneys besides Rodis and
11  Chavarela who provided assistance at times, D'Antonio, RLG, and
12  ALG name the same attorneys.  (RLG Opp., Doc. 245 at 6
13  (identifying Erik Brimmer, Barbara Marie Dennis, and Jennifer
14  Lee); B.D. Opp., Doc 247 at 13 ("There were five attorneys
15  working on client files, Rodis, Chaverela [sic], Erik Brimmer,
16  Maria Dennis, and Jennifer Lee); Def. ALG's Designated Decls. of
17  Jane A. Marchman and Nader E. Qsar, Doc. 263, at 3 (stating that
18  Erik Brimmer, Barbara Marie ("Maria") Dennis, and Jennifer J. Lee
19  worked with Chavarela on ALG files.))

20        42.  In an April 16, 2009 press release issued by
21  Contempt Defendants to announce the "Homeowner's Benefit
22  Program," it states, quoting Chavarela, that ALG "is currently in
23  the process of helping almost 2,000 customers modify their loan
24  payments in order to stay in their homes."  (Ex. 59.)  The chart
25  that Qsar helped prepare for the Receiver after May 28, 2009 (Ex.
26  38) identified 1,760 RLG clients and 408 ALG clients – a total of
27  2,168.  Thus, the press release total of "almost 2,000" clearly
28  referred to the combined total number of clients.

14

1        43.   ALG was merely a continuation of the RLG

2  foreclosure prevention and loan modification operation run by

3  D'Antonio.  (Exs. 21, 24; Temp. Receiver's Rpt., Doc. 119 at 74-

4  77; McCullar Decl. ¶¶ 12-19; McCullar Dep. 190:24-191:10, 192:20-

5  25; Pocasangre Decl. ¶ 12.)  When the name of the company was

6  changed from RLG to ALG, D'Antonio maintained control over the

7  foreclosure prevention and loan modification operation.

8  (McCullar Decl. ¶ 15.)

9        44.   D'Antonio identified himself as Senior Managing

10  Director for ALG to ALG staff (Temp. Receiver's Rpt., Doc. 119 at

11  16 (approving a $4,000 refund on May 27, 2009) and 30 (approving

12  reimbursement from ALG to TFG on April 21, 2009); Kane Decl. ¶ 3;

13  K. Johnson Decl. ¶ 3).  In addition, D'Antonio identified himself

14  as an ALG Director in a sworn financial statement, stating that

15  he earned $128,000 for two months work (D'Antonio Decl., Doc. 116

16  at 6).

17        45.   D'Antonio controlled the ALG funds.  D'Antonio,

18  Sandy Le, and Ngoc Mong Le were the signatories on the bank

19  accounts of The Law Offices of Nicholas Chavarela, Inc. – but,

20  significantly, Chavarela was not.  (Exs. 13, 14; Temp. Receiver's

21  Rpt., Doc. 119 at 7.)  D'Antonio's approval was required for

22  refunds to ALG customers (Temp. Receiver's Rpt., Doc. 119 at 16).

23  D'Antonio wired $100,000 from an ALG account to a personal

24  account on May 8, 2009.  (Supp. Decl. of K. Johnson, Att. A-4.)

25        46.   According to the Temporary Receiver's Report, ALG

26  had gross service revenues of approximately $986,000 in 2009.

27  (*Id*. at 13.)

28        47.   Chavarela admitted that ALG had not conducted a

1   forensic audit.  (Kane Decl. ¶ 6; Temp. Receiver's Rpt., Doc. 119

2   at 10.)

3                4.   *Contempt Defendant TFG*

4      48.  TFG has not entered an appearance or contested any

5   of the allegations in the FTC's motions and applications.

6      49.  TFG is also located at 1100 Town and Country Road,

7   Orange, California.  (R. Lewis Decl. ¶ 42.)

8      50.  D'Antonio is a signatory on multiple TFG bank

9   accounts.  (*Id.* ¶ 28, Att. CC-421.)

10      51.  D'Antonio identified himself as the Owner,

11   Secretary, President, and Chief Executive Officer ("CEO") of TFG

12   to U.S. Bank, a bank used by TFG.  (*Id.* ¶ 30, Att. CC-440-41,

13   452.)

14      52.  D'Antonio controlled TFG and all of the activities

15   it performed in conjunction with RLG and ALG.  (Temp. Receiver's

16   Rpt., Doc. 119 at 5; Kane Decl. ¶ 3; K. Johnson Decl. ¶ 3.)

17      53.  D'Antonio approved transfers of funds from ALG

18   accounts to TFG accounts.  (Temp. Receiver's Rpt., Doc. 119 at

19   30-31.)  Funds were transferred between RLG and TFG on multiple

20   occasions.  (R. Lewis Decl. ¶ 32, Att. GG.)

21      54.  Although some RLG employee paychecks were issued

22   from RLG  (*see*, *e.g.*, Qsar Dep. 28:4-8), many other RLG employee

23   paychecks were issued from a TFG bank account, issued by "The

24   Financial Group, Inc. dba Tax Relief ASAP."  (R. Lewis Decl. ¶

25   31, Att. II-473-561; McCullar Decl. ¶ 7; Dyssegard Dep. 114:12-

26   17.)

27      55.  Charges for RLG's services appeared on customers'

28   accounts as both TFG and Tax Relief ASAP, as well as RLG. (Brand

1  Decl. ¶ 9; Barrett-Sparrow Decl. Ex. 5; Castro Decl. Exs. 4, 6,

2  7; Hottel Decl. Ex. 4; Linares Decl. Ex. 4; Pocasangre Decl. Att.

3  B-15; Reyes Decl. Ex. 1-9, Ex. 4-20; K. Rodriguez Decl. Ex. 4-

4  17.)  Other consumers made checks payable to RLG.  (Peralta Decl.

5  Ex. 2; Pocasangre Decl. Att. B; Reed Decl. Ex. 3.)

6       56.  RLG, ALG, and TFG used the same human resources,

7  accounting, and information technology staff.  (Temp. Receiver's

8  Rpt., Doc. 119 at 5, 8; McCullar Decl. ¶ 17; Le Decl. ¶ 3; Lekawa

9  Decl. ¶ 4, 8-10.)

10 **II.       Contempt Defendants' Business Practices.**

11           A.    <u>Telemarketing.</u>

12       57.  Contempt Defendants' foreclosure rescue and loan

13 modification operation relied upon a nationwide radio campaign in

14 conjunction with websites to generate thousands of inbound

15 telephone calls from consumers.  (R. Lewis Decl. ¶ 14; Kolozsvary

16 Decl. ¶¶ 1-10, Atts. A-C; Temp. Receiver's Rpt., Doc. 119 at 8.)

17 Contempt Defendants' did not make outbound cold calls to procure

18 customers.

19       58.  When consumers called the advertised numbers, they

20 reached telemarketers at RLG or ALG, who made various

21 representations regarding Contempt Defendants' services.

22 (Barrett-Sparrow Decl. ¶¶ 4-5; Brand Decl. ¶ 2; Caley Decl. ¶¶ 4-

23 5; Castro Decl. ¶¶ 4-5; Eddinger Decl. ¶¶ 2-3; Hottel Decl. ¶¶ 4-

24 5; Mitchell Decl. ¶¶ 5-6; Pocasangre Decl. ¶¶ 2-3; Reed Decl. ¶¶

25 4, 6; Rodriguez Decl. ¶¶ 4, 6; Shusterman Decl. ¶¶ 4-5; R. Lewis

26 Decl. ¶¶ 4, 7.)

27       59.  Consumer Holly Johnson contacted ALG via its

28 website, after hearing a radio advertisement for ALG.  She was

1    subsequently contacted by an ALG telemarketer.  (H. Johnson Decl.

2    ¶¶ 2-3.)  Similarly, consumer Thomas Yeager initially contacted

3    RLG via its website, but testified regarding RLG's aggressive

4    radio campaign in Nevada.  (Yeager Dep. 11:18-13:7, July 28,

5    2009.)

6         60.  Contempt Defendants employed as many as eighty

7    telemarketers, or "intake officers," in February 2009.

8    (Dyssegard Decl. ¶ 12.)  By May 2009, former employee Ralph

9    Osborne oversaw all of Contempt Defendants' telemarketing

10   activity, supervising a sales team of fifty telemarketers and

11   five supervisors.  (Osborne Decl. ¶ 6.)  Osborne trained

12   telemarketers with "explicit instructions about what they could

13   say and what they could not say to clients."  (*Id.* ¶ 14.)

14   Osborne and other intake supervisors in fact trained Contempt

15   Defendants' telemarketers to misrepresent the companies' history

16   of success, the likelihood of obtaining a loan modification, and

17   other material facts.  The telemarketers that Osborne supervised

18   were provided with, and used, deceptive telemarketing scripts.

19        61.  The radio advertisements, websites, and

20   telemarketers' pitches induced consumers to purchase Contempt

21   Defendants' services.  (Barrett-Sparrow Decl. ¶¶ 6-10; Brand

22   Decl. ¶ 9; Caley Decl. ¶¶ 4-17; Castro Decl. ¶¶ 5-10; Eddinger

23   Decl. ¶ 6; Hottel Decl. ¶¶ 5-10; H. Johnson Decl. ¶¶ 3-7; Linares

24   Decl. ¶¶ 5-10; Mitchell Decl. ¶¶ 6-10; Pocasangre Decl. ¶¶ 5-8;

25   Reed Decl. ¶¶ 7-14; Reyes Decl. ¶¶ 5-8; Rodriguez Decl. ¶¶ 6-10;

26   Servin Decl. ¶¶ 7-15; Shusterman Decl. ¶¶ 6-7, 10, 12.)

27        62.  D'Antonio invoked his Fifth Amendment privilege

28   against self-incrimination as to all questions, including but not

limited to, questions related to: (a) his control of and the
operations of RLG, ALG, and TFG; (b) the representations RLG and
ALG made in sales scripts, telephone sales calls, radio
advertisements, and websites; and (c) RLG's and ALG's foreclosure
prevention and loan modification services. (D'Antonio Dep. 17:9-
35:6, 36:8-71:13, 93:13-107:19.)

> B.   Material Misrepresentations.

63.   From October 2008 to mid-April 2009, D'Antonio
marketed purported mortgage rescue services through RLG.
(McCullar Decl. ¶ 12.)  On or about April 10, 2009, D'Antonio and
Farris announced a change in the operation's business name from
RLG to ALG. (*Id.* ¶ 12.)

64.   ALG's and RLG's websites were all but identical,
using the same 800-number for consumers to call for free
consultations. (R. Lewis Decl. ¶ 22, *compare* Ex. 3 *with* Ex. 4.)
One RLG consumer testimonial from "Randy E." thanking RLG for
saving his home and reducing his principal balance was recycled
into a testimonial for ALG. (Ex. 5.)  This testimonial is
fictitious because ALG admitted that none of its customers
received mortgage loan modifications. (Ex. 106.)

65.   ALG's radio advertisements are very similar to
RLG's, encouraging consumers to hire ALG's experienced lawyers
and "Put the power of America's Law Group on your side and keep
your home." (Exs. 36, 60, 61.)

66.   RLG's and ALG's telemarketing scripts and
marketing materials were almost identical. (Temp. Receiver's
Rpt., Doc. 119 at 8-9; K. Johnson Decl. ¶ 4; Kane Decl. ¶ 4;
*compare*, *e.g.*, Ex. 6 (RLG "Seven Things" telemarketing script) *to*

Ex. 17 (ALG "Seven Things" telemarketing script.))

         1.   *Contempt Defendants Misrepresented That They Would Stop Foreclosures.*

    67.  Contempt Defendants represented that they would stop foreclosures and save consumers' homes.  They made these representations in radio advertisements, on their websites, and in telemarketing calls and written communications with consumers. (Dyssegard Decl. ¶¶ 4, 7, 9; Barrett-Sparrow Decl. ¶ 9; Brand Decl. ¶ 4; Caley Decl. ¶¶ 4, 6-12; Castro Decl. ¶ 7, Ex. 1-8; Eddinger Decl. ¶ 4; Hottel Decl. ¶ 5; H. Johnson Decl. ¶ 4; Linares Decl. ¶ 7; Mitchell Decl. ¶ 6; Peralta Decl. ¶ 6; Pocasangre Decl. ¶ 7; Reyes Decl. ¶¶ 5-6; Rodriguez Decl. ¶ 7; Servin Decl. ¶ 11; Shusterman ¶ 4; R. Lewis Decl. ¶¶ 13,15, Att. I-123:7-8, 14-16, Att. J-125:14-15, Att. K-129:13-15, Att. L-147:15-16, Att. O-217:11-12, Att. U-378:24-379:7, Att. V-386-87.)

    68.  Contempt Defendants told consumers they never lost a home to foreclosure.  (*See, e.g.,* R. Lewis Decl., Att. L-146:4-9, Att. M-168:5-7, Att. O-204:23-205:4, Att. R-300:17-20, Att. U-378:22-379:**7**; Barrett-Sparrow Decl. ¶ 9; Rodriguez Decl. ¶ 7.)

    69.  Contrary to these promises, consumers lost homes to foreclosure.  (Brand Decl. ¶¶ 11,14; Eddinger Decl. ¶¶ 7, 9-10; Reyes Decl. ¶¶ 17-18, 23; *see also* Rudder Decl. ¶ 27; J. Smith Decl. ¶ 30 (legal support staff were unable to prevent the loss of some consumers' homes to foreclosure); RLG Opp. Att. B (Rodis states foreclosure client lost his home and hired another attorney who threatened malpractice.))  Other consumers listed their homes for sale when RLG failed to help them.  (Rodriguez Decl. ¶ 31; Shusterman Decl. ¶ 26.)

70.   Moreover, as many as fifty RLG customers had foreclosure sales scheduled after they became clients. (*See*, *e.g.*, Castro Decl. ¶ 23; Mitchell Decl. ¶ 19; Servin Decl. ¶ 31; *see also* Rudder Decl. ¶ 37; J. Smith Decl. ¶ 29.)

### 2.   *Contempt Defendants Misrepresented That They Would Modify Consumers' Mortgages.*

71.   Contempt Defendants represented that they would "rewrite" and modify mortgages by negotiating substantially lower interest rates, lower and more affordable monthly payments, and reduced principal balances.  Contempt Defendants told consumers they routinely obtained these results and had a 90% or 100% success rate in obtaining loan modifications.  (Barrett-Sparrow Decl. ¶¶ 7-10; Brand Decl. ¶ 7; Caley Decl. ¶¶ 6-14; Castro Decl. ¶¶ 5-9; Hottel Decl. ¶¶ 5-9; H. Johnson Decl. ¶¶ 3-4; Linares Decl. ¶¶ 6-9; Mitchell Decl. ¶ 8; Peralta Decl. ¶ 6; Pocasangre Decl. ¶¶ 5-8; Reed Decl. ¶¶ 7-8; Reyes Decl. ¶¶ 5-6; Rodriguez Decl. ¶¶ 6-7; Servin Decl. ¶¶ 8-11; Shusterman Decl. ¶¶ 5-7; Yeager Dep. 16:24-17:12, 22:21-24:14, 24:18-25:5, Ex. 40; R. Lewis Decl. ¶ 8, Att. G-64:2-4, 69:22-23, 79:7-8, Att. H-105:8-10, 106:1-3, Att. J-125:9-13, Att. L-145:6-10, Att. M-158:7-11, 163:2-7, Att. N-185:20-25, 187:19-188:2, Att. O-205:13-21, Att. Q-268:17-20, Att. R-294:17-295:6, Att. S-321:9-10, Att. T-353:22-25; Dyssegard Decl. ¶¶ 6-7, 9, Att. B; Temp. Receiver's Rpt., Doc. 119 at 9, 33-46; K. Johnson Decl. ¶ 4; Kane Decl. ¶ 4.)

72.   For example, Contempt Defendants' representations include, but are not limited to the following:

a.   Telemarketers told Mary Barrett-Sparrow that they "could reduce the principal balance of [her] home

1    loan by fifty percent (50%)" and "they could probably

2    take [her] interest rate down to about three percent

3    (3%)."  (Barrett-Sparrow Decl. ¶ 7.)

4         b.   RLG telemarketer "Shu" told Deborah Caley

5    that she "did not know of any instance where one of

6    RLG's clients lost his home to foreclosure," that "RLG

7    would certainly lower [her] interest rate, and possibly

8    reduce it by as much as 4%," and that "RLG had a high

9    success rate because it had relationships with

10   lenders."  (Caley Decl. ¶ 11.)

11        c.   RLG promised John Hottel a reduced interest

12   rate and reduced principal balance and stated that

13   interest rate reductions of 4-5% were typical.  (Hottel

14   Decl. ¶¶ 5-6.)

15        d.   Mark Berman, an RLG telemarketer, told

16   Maricela Pocasangre that RLG reduced interest rates

17   "100 percent of the time" and promised her an interest

18   rate reduction of between three and six percent.

19   (Pocasangre Decl. ¶ 5; R. Lewis Decl. Att. S-321:6-14.)

20        e.        Rodis told Mary Reyes that RLG was

21   ninety percent (90%) successful.  (Reyes Decl. ¶ 6.)

22        73.  The evidence of Contempt Defendants'

23   representations, submitted via consumer testimony, transcripts of

24   recordings between telemarketers and consumers, and former

25   employees, matches the representations in Contempt Defendants'

26   sales scripts, including "rebuttal scripts," about the high

27   likelihood that Contempt Defendants would negotiate a mortgage

28   loan modification resulting in substantial reductions in monthly

1   mortgage payments.  For example, scripts prompted telemarketers
2   to tell consumers that:

3          a.    "Now when we take on a client we routinely
4                postpone trustee sales, lower monthly payments and even
5                negotiate for a reduction in principal loan amounts."
6                (Ex. 9; Temp Receiver's Rpt., Doc. 119 at 42; *see also*
7                Exs. 6, 8, 17, 18 (substantially similar
8                representations about "routine" or "typical" results.))

9          b.    "As A Law Firm We Have Not Taken On A Case We
10               Can't Resolve."  (Temp. Receiver's Rpt., Doc. 119 at
11               33.)

12         c.    "We are a Law Firm, if we do take you on as a
13               client, we will significantly REDUCE your payments,
14               even potentially lowering your principal balance, and
15               getting the lenders to forgive any late payments you
16               may have incurred."  (*Id.* at 36.)

17         d.    "What is your success rate in cases like
18               mine?  A) Well, we wouldn't take you on as a client if
19               we weren't confident we can help you."  (*Id.*)

20         e.    "We are a Law Firm, our job is to save your
21               home."  (*Id.*)

22         74.   The Receiver found copies of scripts containing
23   these representations on one-third to one-half of the work areas
24   in the telemarketers' work areas.  (K. Johnson Decl. ¶ 4.)

25         75.   Telemarketers also told customers that they would
26   not lose their homes even if they paid Contempt Defendants
27   instead of making a mortgage payment.  (R. Lewis Decl. Att. M-
28   167:25-168:7, Att. O-211:14-215:22, Att. P-234:25-235:5, Att. S-

333:5-14; Att. U-378:24-379:7; Barrett-Sparrow Decl. ¶ 8; Caley
Decl. ¶ 12; Hottel Decl. ¶ 8; Linares Decl. ¶ 9; Pocasangre Decl.
¶ 7; Reed Decl. ¶ 9; Reyes Decl. ¶ 6; Servin Decl. ¶ 8.)  These
representations correspond to sales script language prompting
telemarketers to tell consumers that

> if you "feel that is it [sic] in your best
> interest not to make your payements [sic],
> you don't have to and we will neg. any future
> late payments you incur to be
> eliminated/waived."  Also, most of our
> clients . . . what they "elect" to do is save
> those payments and create a cash reserve
> fund.

(Ex. 8.)

76.  RLG did not deliver on its promises to modify
mortgage loans.  In addition to the consumers who received
foreclosure notices and lost their homes, multiple consumers
testified about the lack of results obtained on their behalf by
Contempt Defendants.  (*See, e.g.*, Barrett-Sparrow Decl. ¶¶ 16-24;
Caley Decl ¶¶ 18-31; Castro Decl. ¶¶ 10-24; Hottel Decl. ¶¶ 13-
21; Mitchell Decl. ¶¶ 10-14; Peralta Decl. ¶¶ 9-16; Pocasangre
Decl. ¶¶ 11-12; Reed Decl. ¶¶ 14-23; Rodriguez Decl. ¶¶ 11-24;
Servin Decl. ¶¶ 16-26; Shusterman Decl. ¶¶ 12-22.)

77.  Consumer testimony submitted by the Contempt
Defendants  demonstrates a lack of the promised results.  Of
eight consumer declarants submitted by D'Antonio, half did not
obtain successful results, despite having retained RLG's services
six to eight months before the Receiver took control of Contempt

Defendants' premises.  (*See* Aiello Decl., Doc. 252-2; Bernard Decl., Doc 252-4; Dynek Decl., Doc. 252-5; Young Decl., Doc. 252-9.)  Of the remaining four declarants, two testified that they received mortgage loan modifications (Olsen Decl., Doc. 252-6; Spallino Decl., Doc. 252-8), and the other two, each of whom had multiple properties, testified that they experienced only partial success with Contempt Defendants' assistance (Barton Decl., Doc. 252-3; Ray Decl. 252-7).

78.  Qsar created a chart indicating fifty-one loan modifications for 2,138 combined clients of RLG and ALG.  (Ex. 38).  He estimated that "fifty-one plus another probably handful, dozen, still that needed to go to the attorney for final review, so I would say close to a hundred" RLG customers received loan modifications.  (Qsar Dep. 96:21-24.)

79.  ALG admitted in its Further Responses and Objections to Plaintiff FTC's First Set of Interrogatories that it attained no completed loan modifications on behalf of clients who retained services while the operation used the name ALG. (Ex. 106.)

80.  The Receiver reviewed files for the fifty-one customers that Qsar identified as "mod approved," plus an additional 43 files identified by Rodis, and found that eight received completed loan modifications.  (Temp. Receiver's Rpt., Doc. 119 at 6, 11; Kane Decl. ¶¶ 7.)

81.  In an April 12, 2009 email, D'Antonio admitted that eleven out of 1,311 clients – or 0.84% – were categorized as "Mod Approved."  (Kane Decl. Att. B; V. Nguyen Decl. Att. B.) Qsar testified that "Mod Approved" meant that a lender had

1    actually approved a modification.  (Qsar Dep. 35: 11-14.)

2        82.  FTC economist Patrick McAlvanah identified a

3    random sample comprised of fifty-five customers of Contempt

4    Defendants[3]; the FTC was able to locate files for forty-nine of

5    those customers among the business records obtained from Contempt

6    Defendants' premises.  A review of the paper files, as well as

7    the corresponding "Activity Logs" (logs documenting Contempt

8    Defendants' conversations and other actions performed in

9    connection with the files, sometimes called "con logs" (McCullar

10   Dep. 72:11-15)), revealed that one of the forty-nine received a

11   mortgage loan modification (Parnes Decl. ¶ 6, October 21, 2009;

12   Supp. Parnes Decl. ¶¶ 6-7, Nov. 10, 2009).

13              3.   *Contempt Defendants Misrepresented That*

14                   *Highly Qualified Attorneys Would Prevent*

15                   *Foreclosures and Negotiate Modified*

16                   *Mortgages.*

17        83.  Contempt Defendants told consumers that

18   experienced attorneys would aggressively negotiate on their

19   behalf.  In radio advertisements, websites, e-mails, and

20   telemarketing calls, Contempt Defendants told consumers they had

21   multiple attorneys with foreclosure prevention and mortgage loan

22   modification expertise.  (Dyssegard Decl., Att. B; R. Lewis Decl.

23   _____

24       [3] The fifty-five customers were selected from a sub-set of
     1,208 of the collective total of RLG and ALG clients by
25   restricting a "date name" field to yield an initial pool
     comprised of individuals who became customers of Contempt
26   Defendants between October 2008 and February 2009 – a data pool
     that, given Contempt Defendants' telemarketing claims that it
27   takes six weeks to three months to complete a loan modification,
     would be most likely to yield favorable results for Contempt
28   Defendants.  (*See* McAlvanah Decl. ¶¶ 4-5.)

Att. I-121:7-12, Att. J-125: 6-8, Att. K-129:9-12; Att. M-160:17-19, Att. N-185:20-25, Att. O-198:19-24, Att. P-229:14-18, Att. R-297:12-16, 302:7-19, Att. S-324:18-23, Att. U-377:22-23, Att. V-386-87, Att. Y-408-09, Att. QQ-584; Castro Decl. Ex. 1-8.)

84.  Contempt Defendants' representations about their staff and experience, which were often intermingled with other representations about successful results, included, but were not limited to telling consumers:

a.  "My staff of real estate attorneys will fight for you.  I have been protecting homeowners like you since 1996, and my team of experienced attorneys are highly skilled in negotiating lower interest rates and even lowering your principal balance.  Yes, I said even lowering your principal balance." (R. Lewis Decl. Att. I-121:8-13 (radio advertisement.))

b.  "[Lenders] won't do anything for you unless you have an attorney in your corner.  So, that's why we're so successful at what we do.  We're actually 100 percent successful.  We've never had one instance where a lender is not willing to work with us." (R. Lewis Decl. Att. N-185:20-25 (telemarketer.))

c.  "[W]e're a law firm.  We're a law firm. We're made up of several real estate attorneys and we've been doing this for over a decade now, so before this mortgage meltdown even started. . . . if the California Bar Association would let us use the word "guarantee" we would be because we are 100 percent successful.  We've never ever had one instance where a

1 lender is not willing to work with us."  (R. Lewis
2 Decl. Att. R-302:7-19 (telemarketer.))
3   d. "We are not mortgage brokers, nor realtors.
4 We are skilled Attorneys who act as tough negotiators
5 between the homeowner and the lender . . . . With our
6 state of the art software and professional staff of
7 attorneys, paralegals, compliance officers, asset
8 managers, real estate agents and brokers we have the
9 experience necessary to achieve the most dynamic
10 resolutions available and help stop foreclosure fast
11 and effectively in this troubled market."  (R. Lewis
12 Decl. Att. V-386-87 (RLG website.))
13   e. "We are not mortgage brokers, nor realtors.
14 We are a law firm with licensed attorneys who act as
15 tough negotiators between the home owner and lender . .
16 . . With our state of the art software and professional
17 staff of licensed attorneys, paralegals, compliance
18 officers, asset managers, real estate agents and
19 brokers we have the experience necessary to achieve the
20 most dynamic resolutions available and help stop
21 foreclosure fast and effectively in this troubled
22 market." (*Id*. Att. Y-408-09 (ALG website.))
23   f. "[RLG] is the leading Law Firm in the
24 country, specializing in renegotiating mortgage
25 contracts.  Ron Rodis has personally been involved in
26 real estate law since 1996 and has extensive contract
27 and litigation experience.  The other attorneys on
28 staff are all highly skilled in real estate law and

28

1   renegotiating mortgage contracts." (Castro Decl. Ex.

2   1-8 (e-mail from telemarketer to consumer); *see also*

3   Linares Decl. Ex. 1-7; Temp. Receiver's Rpt., Doc. 119

4   at 39-40.))

5        85.  These claims induced consumers to pay for Contempt

6   Defendants' purported services.  For example:

7        a.   "I wanted a firm with actual lawyers to

8        handle my loan modification case since the bank likely

9        had attorneys on its side.  Thus, RLG was more

10       appealing to me than other companies, because its

11       advertisement made it seem that the firm consisted of

12       several experienced attorneys that would be handling my

13       loan modification." (Hottel Decl. ¶ 4.)

14       b.   "I felt comfortable ultimately hiring RLG and

15       paying the upfront fee in part because I believed that

16       RLG was a reputable law firm." (Caley Decl. ¶ 10.)

17       c.   "The biggest selling point for me, however,

18       was that [the telemarketer] told me that an attorney

19       would ultimately be responsible for my case.  This was

20       the primary reason that I decided to hire RLG in

21       January 2009." (Servin Decl. ¶ 11; *see also id*. ¶ 4.)

22       d.   Other consumers' testimony similarly

23       demonstrates that the claims about the experience and

24       role of attorneys induced them to pay Contempt

25       Defendants' retainer fees. (Barrett-Sparrow Decl. ¶¶ 9-

26       10; Castro Decl. ¶ 6; Reed Decl. ¶ 5, 7; Reyes Decl. ¶¶

27       5-8; Shusterman Decl. ¶ 10.)

28       86.  The evidence of Contempt Defendants'

representations about the number and experience of attorneys and others on staff, submitted via consumer testimony, transcripts of recordings between telemarketers and consumers, former employee testimony, radio advertisement transcripts, and copies of the RLG and ALG websites, matches the representations in Contempt Defendants' sales scripts.  Scripts, which the Receiver found in one-third to one-half of the telemarketers' work areas, prompted telemarketers to, *inter alia*, tell consumers that:

> a.   "Our lead attorney Ron Rodis has been doing this since 1996 and every case he has brought on has had principle [sic] reduction or rate reduction." (Temp. Receiver's Rpt., Doc. 119 at 33.)

> b.   "[W]e are a law firm, and we won't take on your case unless we are confident we can help your situation." (*Id.* at 34)

> c.   "How come I couldn't do this on my own?  What makes you different?  A) Well, you don't have a Law Degree, do you?  You are hiring a Law Group that has been re-writing mortgage contracts since 1996.  Our Legal Team will be fighting on your behalf with their Legal Team."  (*Id.* at 35.)

> d.   "We are a Law Firm, if we do take you on as a client, we will significantly REDUCE your payments, even potentially lowering your principal balance, and getting the lenders to forgive any late payments you may have incurred."  (*Id.* at 36.)

> e.   "We are a law firm made up of real estate attorneys who have been helping homeowners save their

homes from foreclosure and battling mortgage lenders
for more than a decade now . . . So we were rewriting
the terms and conditions of our clients' mortgages way
before the term "Loan Modification" was even used.
(Ex. 7.)

  f. "We are NOT a loan modification company.  We
are a Law Firm.  Our Attorneys are Federally Licensed,
we represent you in court, will they?" and "All of our
Attorneys are licensed in Federal Court so we will be
able to represent you in any State."  (Temp. Receiver's
Rpt., Doc. 119 at 36 (scripted responses to "Typical
Objections" about how Contempt Defendants are different
and how they can represent consumers outside of
California.))

  87. Contempt Defendants did not employ the promised
"team" or "staff" of experienced real estate attorneys
purportedly working aggressively on customers' behalf.  Rodis was
the only lawyer whose involvement with RLG spanned the entire
October 2008 to May 2009 time period.  (Rudder Decl. at 90 ¶ 15;
J. Smith Decl. ¶¶ 12-13.)

  88. Rodis' involvement with the great majority of
customer files was minimal (N. Nguyen Decl. ¶¶ 23-26; Rudder
Decl. ¶¶ 10, 38-41), and for the limited number of customer files
he did work on, his involvement was often reluctant, amounted
primarily to assuaging irate customers, and rarely involved
discussions with lenders.  (Rudder Decl. ¶¶ 38-40; J. Smith Decl.
¶¶ 31-32; *see also* Rodis Dep. 58:9-22; 59:1-8.)

  89. In January 2009, Rodis acknowledged that it was

1   "physically impossible" for him to speak to clients in a timely

2   manner based on the high volume of clients (RLG Opp. Ex. B.)

3   Consumer Testimony corroborates Rodis' and former employee

4   testimony regarding his limited involvement.

5        90.   D'Antonio hired Chavarela in March 2009, initially

6   as Senior Partner at RLG.   (Exs. 24, 53.)   Chavarela was later

7   identified as ALG's managing attorney.   (Ex. 59.)   Chavarela

8   declined to answer questions regarding his experience at his

9   deposition, instead invoking his Fifth Amendment right against

10  self-incrimination as to all questions.   (Chavarela Dep. 11:2-

11  13:3.)   However, at the November 18, 2009 contempt hearing,

12  Chavarela's counsel noted that Chavarela has been admitted to

13  practice for less than two years (see also R. Lewis Decl. Att.

14  NN) and stated that Chavarela had taken continuing legal

15  education courses regarding mortgages and loan modification.

16       91.   Besides Rodis and Chavarela, other attorneys at

17  times worked on customer files, but they lacked the promised

18  experience.   Nhahanh Nguyen worked at RLG for just three days in

19  February 2009 (N. Nguyen Decl. ¶ 2); she was admitted to practice

20  in November 2008 (id. ¶ 3; R. Lewis Decl. Att. PP).   Erik Brimmer

21  transferred to RLG from TFG dba Tax Relief ASAP in January or

22  February 2009; he lacked experience with mortgage loan

23  modifications and "shadowed" existing legal support staff to

24  learn what to do.   (Rudder ¶ 17; J. Smith Decl. ¶¶ 13-14.)

25  Contempt Defendants identify Brimmer, as well as Barbara Marie

26  "Maria" Dennis, and Jennifer Lee, as attorneys involved with the

27  operation.   RLG's Opposition Brief states that Brimmer and Dennis

28  worked for RLG from January to May 2009 and that Lee joined the

staff in May 2009, and D'Antonio, RLG, and ALG each claim that Brimmer, Dennis, and Lee were attorneys who assisted Rodis and Chavarela.  Otherwise, there is no record evidence regarding these employment dates, or the experience of either Dennis or Lee.

92.  Most of the non-attorney staff did not have foreclosure prevention or loan modification experience, and Contempt Defendants did not provide instruction or training in preventing foreclosures or obtaining loan modifications between November 2008 and mid-April 2009.  (*See* Rudder Decl. ¶¶ 19, 29-30, J. Smith ¶ 22; Temp. Receiver's Rpt., Doc. 119 at 5-6; K. Johnson Decl. ¶ 5; Kane Decl. ¶ 5; Qsar Dep. 75:21-77:13.)  To the extent that Contempt Defendants began hiring staff with more experience and started providing more training in mid-April, the timing of the changed practices coincided with public announcements about law enforcement activity in the mortgage loan and foreclosure relief area.

> 4.  *Contempt Defendants Misrepresented That They Conducted "Forensic" Analyses of Consumers' Mortgages.*

93.  Contempt Defendants also told consumers they would conduct forensic analyses of their mortgages to use as leverage in negotiations with lenders.  (Temp. Receiver's Rpt., Doc. 119 at 9.)  The websites and telemarketers claimed that experienced real estate attorneys would carefully review and analyze consumers' mortgages for legal violations.  (Brand Decl. ¶ 8; R. Lewis Decl. Att. M-164:20-165:7, Att. V-386.)

94.  The websites highlighted Contempt Defendants'

promises to conduct a customized forensic review of each
consumer's case:

> There simply is not one right solution for
> everyone, and no one can tell you what is
> right for you without thoroughly analyzing
> your legal rights, financial situation and a
> **forensic audit** of your loan documents.  We
> understand the mortgage industry from years
> of experience and will use leverage to
> negotiate to benefit you.

(R. Lewis Decl. Att. V-386, Att. Y-409; Exs. 3, 4.) (Emphasis
added.)

95.   Contempt Defendants admit they did not conduct a
single "forensic analysis" of a customer's mortgage loan
documents.  (Temp. Receiver's Rpt., Doc. 119 at 10; Kane Decl. ¶
6; *see also* Qsar Dep. 21:16-21.)

96.   Both Rodis and Chavarela stated that any such
audit "would need to be outsourced," but there is no evidence
that Contempt Defendants ever outsourced such an audit.  (Temp.
Receiver's Rpt., Doc. 119 at 10; Kane Decl. ¶ 6.)  Both Rodis and
Chavarela declined to answer questions regarding forensic audits
during their respective depositions, instead invoking their Fifth
Amendment rights against self-incrimination as to all questions.
(Rodis Dep. 41:7-19, 56:9-57:8; Chavarela Dep. 21:6-19, 24:16-
25:8.)

//

//

//

5.   *Contempt Defendants Changed Policies and*
     *Practices After They Learned of the FTC's*
     *Investigation.*

     a.   Contempt Defendants introduced
          disclaimers and terminated a group of
          recent telemarketer hires after they
          learned of the FTC's investigation.

97.   D'Antonio suspected there was an FTC investigation sometime between January 14, 2009, and early February 2009. Christi D'Antonio held a meeting, which Bryan D'Antonio attended, at which she told staff to be careful what they said on the phone and directed them to follow up on every single file by the end of the day, because they "had caught wind of an FTC investigation." (Rudder Dep. 83:3-84:12.)  The meeting took place sometime after a meeting with Bryan D'Antonio that Sarah Rudder testified took place on January 14, 2009 (Rudder Dep. 66:8-73:14), and before Rudder resigned from RLG in early February 2009 (Rudder Decl. ¶ 2).

98.   During the same period, in late January or early February 2009, RLG instructed its telemarketers to add a "no guarantee" disclaimer at the end of the sales pitch.  (Dyssegard Decl. ¶¶ 2, 10; McCullar Dep. 163:21-164:4.)

99.   To the extent RLG may have provided the disclaimer to consumers, telemarketers were instructed to do so only *after* they concluded their sales pitch, including the misrepresentations.  (*See* Dyssegard Decl. ¶ 10; Dyssegard Dep. 136:2-9; McCullar Dep. 265:13-23.)  Similarly, Contempt Defendants' retainer agreements included a "No Guarantee-

Scheduling" provision. (*See, e.g.*, Barrett-Sparrow Decl. Ex. 1;
Caley Decl. Ex. 2; Doc. 131 Ex. C.)  The provision appears,
however, at the end of three pages of legalese addressing such
topics as arbitration, referral fees, jurisdiction, and
severability. (Barrett-Sparrow Decl. Ex. 1; Caley Decl. Ex. 2;
Doc. 131, Ex. C.)  The agreement disclaims any representations
regarding success or outcome (Barrett-Sparrow Decl. Ex. 1; Caley
Decl. Ex. 2; Doc. 131, Att. C at 19), but was sent to consumers
only *after* telemarketers completed the sales pitch that contained
numerous promises about results. (R. Lewis Decl. Att. G-79:4-9
(RLG telemarketer told FTC undercover investigator that, despite
retainer agreement language, loan would be modified); *see also*
Temp. Receiver's Rpt., Doc. 119 at 34 (script for rebutting
question "What is my guarantee?" directs telemarketers to state
"We only bring on cases that we are confident we can help" or
that law firms cannot guarantee an outcome, but "we won't take on
your case unless we are confident we can help your situation");
*id.* at 37 (script for rebutting questions about refunds, "we
wouldn't take you on as a client if we weren't confident we can
help you."))

100. During the corresponding time period, in early
February 2009, Contempt Defendants terminated Dyssegard, along
with the other telemarketers who had been in his class of new
hires. (Dyssegard Decl. ¶ 2.)

101. Contempt Defendants made an effort to hire more
legal support staff around the same time period, beginning in
February or March 2009. (Castillo Decl. ¶ 5.)

//

b.  Contempt Defendants implemented other operational changes after the FTC and other federal and state law enforcement agencies announced a crackdown on mortgage relief fraud.

102.  On April 6, 2009, the FTC, the United States Department of Justice (DOJ), the United States Department of Housing and Urban Development (HUD), and state Attorneys General announced a crackdown on fraud and deception in the mortgage relief area.  FTC Chairman Jon Leibowitz, Treasury Secretary Timothy Geithner, United States Attorney General Eric Holder, HUD Secretary Shaun Donovan, and Illinois Attorney General Lisa Madigan participated in a widely covered press conference.  Among other actions and initiatives, the FTC announced four law enforcement actions alleging deceptive practices by loan modification companies, including one in Orange County, California.  (Supp. Parnes Decl. Att. B., Doc. 276.)

103.  Shortly thereafter, Contempt Defendants purportedly took steps to implement policies and procedures to return client phone calls and keep track of client files.  These policies were largely unsuccessful, as consumers still had a difficult time reaching someone at RLG or ALG who could answer their questions.  (*See* Caley Decl. ¶ 24; Hottel Decl. ¶ 18; Mitchell Decl. ¶¶ 13-14; Reed Decl. ¶ 20; Servin Decl. ¶ 23; Shusterman Decl. ¶ 18.)  In addition, the Receiver found that, on May 28, 2009, the client files "were not physically maintained in a systematic or orderly manner."  (K. Johnson Decl. ¶ 6.)  Contempt Defendants also hired additional legal support personnel

37

and made a concerted effort to submit a large number of loan modification packages to lenders, including "aged" clients whose files had been sitting untouched for months.  (Qsar Dep. 75:21-77:13; DelGallego Decl. ¶ 5.)

104. Qsar, who began work with Contempt Defendants on March 6, 2009 (Qsar Decl. ¶ 1), testified that 700 loan modification application packages were submitted during his tenure (Qsar Dep. 22:2-13), and that he implemented effective new policies in mid-April 2009 (*id.* 14:5-15:1).  Even this were true, and the Court does not find it to be true that 700 loan packages were submitted, it would mean that virtually every loan modification package submitted to lenders by the Contempt Defendants was submitted during the six-week period between the government's April 6, 2009 announcement of a crackdown on loan modification fraud and entry of the TRO.

106.  According to the Temporary Receiver's Report, the combined entities' books and records disclose total intake of $12,116,252 from consumers, with $1,483,469 thereof refunded to consumers.  (Temp. Receiver's Rpt., Doc. 119 at 90-91.)

**III.**

**CONCLUSIONS OF LAW**

I.       **The Court Has Inherent Power to Enforce the Permanent Injunction through Civil Contempt**

A.   Jurisdiction.

1.   The Court has jurisdiction over this matter for all purposes, as specifically reserved in Section XV ("Continued Jurisdiction") of the Permanent Injunction.  (Doc. 74.)

//

B.   <u>Legal Standard for Civil Contempt.</u>

2.   The Court has the inherent power to enforce its Permanent Injunction through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 1535, 16 L. Ed. 2d 622 (1966). As a party to the original action, the FTC may invoke the court's power by initiating a proceeding for civil contempt. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444-45, 31 S. Ct. 492, 55 L. Ed. 797 (1911). The contempt "need not be willful," and there is no good faith exception to the requirement of obedience to a court order. *Stone v. City and County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992); *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987).

3.   "The standard for finding a party in civil contempt is well settled: 'The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.'" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (citations omitted). The contemnors "must show they took every reasonable step to comply." *Stone*, 968 F.2d at 856; *SEC v. Children's Internet, Inc.*, 2009 WL 2160660, *2 (N.D. Cal., July 20, 2009).

4.   Third parties, such as RLG, ALG, and Financial Group, are subject to an injunctive order when they are "in active concert or participation with [a party]" and "receive actual notice of [the order] by personal service or otherwise." Fed. R. Civ. P. 65(d)(2).

1    C.   The Permanent Injunction Applies to Contempt
2         Defendants.

3         5.   Clear and convincing evidence establishes that the
4    Permanent Injunction applies to all of the Contempt Defendants.

5              1.   *Contempt Defendant D'Antonio Is Bound by the*
6                   *Permanent Injunction.*

7         6.   The Permanent Injunction binds D'Antonio because
8    he was a party to the original litigation in this matter and
9    signed an affidavit declaring that he received that order.

10             2.   *Contempt Defendant RLG Is Bound by the*
11                  *Permanent Injunction.*

12        7.   The Permanent Injunction binds RLG because it had
13   actual notice of the Permanent Injunction and acted in concert
14   and participation with D'Antonio.  Fed. R. Civ. P. 65(d).

15        8.   The knowledge of a company's officer and manager
16   is imputed to the company.  Cal. Civ. Code § 2332; *See Bank of*
17   *New York v. Fremont General Corp.*, 523 F.3d 902, 911 (9th Cir.
18   2008) ("'Generally, the knowledge of a corporate officer within
19   the scope of his employment is the knowledge of the corporation.'
20   *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242, 54 Cal.
21   Rptr. 786, 800-01 (1966)."); *United States v. One Parcel of Land*
22   *Located at 7326 Highway 45 North, Three Lakes, Oneida County,*
23   *Wisconsin*, 965 F.2d 311, 316 (7th Cir. 1992) ("a corporation
24   'knows' through its agents"); *People v. Forest E. Olson, Inc.*,
25   137 Cal. App. 3d 137, 140, 186 Cal. Rptr. 804, 806-07 (Cal. Ct.
26   App. 1982).  *See also FTC v. Neiswonger*, 494 F. Supp. 2d 1067,
27   1079 (E.D. Mo. 2007) ("Personal service is not required under
28   Rule 65(d). All that is required is knowledge of the mere

existence of the injunction; not its precise terms.  Furthermore,
direct evidence is not required to sustain the FTC's burden of
showing actual notice."(citation omitted)).

9.   D'Antonio was a *de facto* officer and manager of
RLG.  D'Antonio identified himself as Chief Executive Officer
("CEO") and Senior Manager of RLG in corporate documents and in
written and verbal communications to employees, and he
demonstrated control of RLG by providing the initial financing of
the company, subsequently directing allocation of company funds,
exercising hiring and firing authority, dictating company sales
strategy, and making other operational decisions.  D'Antonio was
a signatory on all of RLG's bank accounts.

10.   D'Antonio, Rodis, and Chavarela each asserted
their Fifth Amendment privilege against self-incrimination when
questioned at their depositions about D'Antonio's title,
ownership, and control over RLG, TFG, and ALG.   Therefore, the
Court infers that D'Antonio was in fact an officer, principal,
and owner of RLG, TFG, and ALG, and that he controlled their
daily operations.  *See SEC v. Gemstar-TV Guide Int'l, Inc.*, 401
F.3d 1031, 1046 (9th Cir. 2005) (citing *SEC v. Colello*, 139 F.3d
674, 677 (9th Cir. 1998)).

11.   D'Antonio was the *de facto* principal and CEO of
RLG/ALG from their inception through May 28, 2009.  *John Paul
Lumber Co. v. Agnew et al.*, 125 Cal. App. 2d 613, 619, 270 P.2d
1044, 1048 (1954) ("A de facto officer of a private corporation
is defined as being one who has the reputation of being the
officer he assumes to be in the exercise of the functions of the
office, and yet is not a good officer in point of law; and as one

who is in possession of an office and discharging its duties under color of authorities.")  D'Antonio controlled the operations until the Receiver took control on May 28, 2009.  From its incorporation on October 20, 2008 through April 1, 2009, when RLG filed a notice with the California Secretary of State listing Ronald Rodis as its sole officer, D'Antonio was the only person who claimed to be CEO of RLG.  D'Antonio's actual knowledge of the Permanent Injunction, while he acted as *de facto* principal and CEO of RLG, is imputed to RLG.  *FTC v. Vocational Guides, Inc.*, 2009 WL 943486 at *15, ¶ 22 (M.D. Tenn. April 6, 2009) ("Because Jackson was Grant Info's *de facto* principal and controlled the company, his knowledge of the Final Order . . . is imputed to Grant Info.")

       12.   In addition, D'Antonio's actual knowledge of the Permanent Injunction is imputed to RLG as its agent acting within the scope of his agency.  D'Antonio exercised ultimate decision-making authority over RLG's contumacious marketing activities. He was, at a minimum, a senior manager with actual and apparent authority over RLG's advertisements, telemarketing, individual telemarketing pitches, collection of fees from consumers, refunds to consumers, and the relative amount of funding to provide to the marketing and service fulfillment sides of RLG's operations. D'Antonio was, if not a principal, RLG's agent for all activities related to RLG's contumacious activities, and, therefore, his actual knowledge of the Permanent Injunction is imputed to RLG. Cal. Civ. Code § 2332.  ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care

and due diligence, to communicate to the other.")

13.   Rodis, whose name and law license were used by RLG, had actual knowledge of the Permanent Injunction since at least March 6, 2009.

14.   RLG acted in concert with D'Antonio.  RLG was the entity through which D'Antonio engaged in telemarketing and made misrepresentations about RLG's foreclosure and loan modification services, from October 2008 through mid-April 2009.

3.   *Contempt Defendant ALG Is Bound by the Permanent Injunction.*

15.   The Permanent Injunction binds Contempt Defendant ALG because it had actual notice of the Permanent Injunction and acted in concert and participation with D'Antonio.  Fed. R. Civ. P. 65(d).

16.   Like RLG, ALG received actual notice of the Permanent Injunction through D'Antonio because he was a *de facto* principal, officer, and controlling manager of ALG (which did not have any formal officers).

17.   D'Antonio identified himself as a Senior Director of ALG in corporate documents and written communications to employees and demonstrated control of ALG by providing the initial financing of the company, subsequently directing allocation of company funds, exercising hiring and firing authority, dictating company sales strategy, and making other operational decisions.  D'Antonio was a signatory on all of ALG's bank accounts.  ALG was a continuation of D'Antonio's foreclosure prevention and loan modification operation begun as RLG.

18.   In addition, ALG received actual notice of the

Permanent Injunction through D'Antonio's role as its agent with control over ALG's telemarketing operations and general advertising.

19.   ALG also acted in concert with D'Antonio.   ALG was the entity through which D'Antonio continued to engage in telemarketing and make misrepresentations about foreclosure and loan modification services, from mid-April 2009 until May 28, 2009, when Contempt Defendants were served with the TRO.

4.   *Contempt Defendant TFG Is Bound by the Permanent Injunction.*

20.   The Permanent Injunction binds Contempt Defendant TFG because it had actual notice of the Permanent Injunction and acted in concert or participation with D'Antonio.   Fed. R. Civ. P. 65(d).

21.   Like RLG and ALG, TFG received actual notice of the Permanent Injunction through D'Antonio because he was a *de facto* principal, officer, and controlling manager of TFG.

22.   D'Antonio identified himself as a Senior Director of TFG in corporate documents and in written and verbal communications to employees, and demonstrated control of TFG by directing allocation of company funds, exercising hiring and firing authority, dictating company sales strategy, and making other operational decisions.

23.   In addition, TFG received actual notice of the Permanent Injunction through D'Antonio's role as its agent with control over TFG's telemarketing operations and general advertising.

24.   TFG received actual notice of the Permanent

Injunction against D'Antonio because TFG was the alter ego of
D'Antonio.  The Contempt Defendant TFG acted on behalf of
D'Antonio and therefore acted with his knowledge.

25.  TFG was in active concert or participation with
D'Antonio, RLG, and ALG.  TFG shared human resources, accounting,
and information technology staff with ALG and RLG, and D'Antonio
was a signatory on bank accounts for all three corporate Contempt
Defendants.  TFG was integrally involved with the management and
allocation of funds between the entities, as well as with the
mortgage rescue operations.

26.  TFG has not made an appearance or contested this
proceeding in any way and is therefore in default.  Based on
TFG's default, along with D'Antonio's assertion of his Fifth
Amendment privilege against self-incrimination when questioned at
his deposition about his title, ownership, and control over TFG,
as well as the clear and convincing evidence of D'Antonio's
control over TFG, the Court concludes that TFG had actual notice
of the Permanent Injunction and acted in concert with D'Antonio.

5.  *TFG  Was an Alter Ego of D'Antonio, and*
*Therefore Is Bound by the Permanent*
*Injunction.*

27.  TFG is bound by the Permanent Injunction as the
alter ego of D'Antonio.  As alter ego of D'Antonio, TFG shares
D'Antonio's knowledge of the Permanent Injunction.  "Under the
alter ego doctrine, . . . [w]hen the corporate form is used to
perpetrate a fraud, circumvent a statute, or accomplish some
other wrongful or inequitable purpose, the courts will ignore the
corporate entity and deem the corporation's acts to be those of

the persons or organizations controlling the corporation, in most instances the equitable owners." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538, 99 Cal. Rptr. 2d 824 (2000); *See also Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1342-43, 90 Cal. Rptr. 589, 619-20 (2009).

28.  To determine whether TFG is the alter ego of D'Antonio, the Court inquires whether:  (1) there is a "unity of interest and ownership" between TFG and D'Antonio, and (2) there will be an "inequitable result" if the company's acts "are treated as those of a corporation alone." *Sonora Diamond*, 83 Cal. App. 4th at 538.[4]  TFG meets this test.  First, the Contempt Defendants used the same employees and offices and were all controlled by D'Antonio and his senior managers.  There is no evidence that the Contempt Defendants followed corporate formalities.  They acted interchangeably and in concert to market and sell mortgage loan modification and foreclosure rescue services.  D'Antonio controlled all expenditures by RLG, TFG, and ALG, and transferred money between these entities and ultimately to his personal accounts.  As the person with ultimate control over all of their assets, and the person who profited directly from their practices, D'Antonio was the equitable owner of RLG, TFG, and ALG.

---

[4]"Factors for the trial court to consider include the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other. . ..  No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Troyk* 171 Cal. App. 4th at 1342, 90 Cal. Rptr. at 619 (citations omitted).

29.   Allowing the non-party Contempt Defendant TFG to circumvent the Permanent Injunction would frustrate the equitable purposes of the Permanent Injunction, undermine the inherent authority of this Court to enforce its orders, and be an "inequitable result." *Troyk*, 171 Cal. App. 4th at 1343, 90 Cal. Rptr. at 620-21.

6.   *Corporate Contempt Defendants Are Bound by the Permanent Injunction as a Common Enterprise.*

30.   Contempt Defendants acted as a common enterprise. Participants in a "common enterprise" share liability for the unlawful practices of any of the participants without regard to their corporate identities or affiliation.  The factors courts typically consider to determine the existence of a "common enterprise" include:  (1) whether purportedly separate corporations share employees, officers and office space; (2) whether corporate entities deal at arms-length; (3) whether corporate entities have their own substantive businesses; and (4) whether there is a commingling of corporate assets.  *See, e.g.,* *FTC v. J.K. Publications,* 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (common enterprise found where corporate defendants were under individual defendant's common control, shared office space, employees, and officers); *See also Sunshine Art Studios v. FTC*, 481 F.2d 1171, 1173, 1175 (1st Cir. 1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427, 431 (7th Cir. 1964); *FTC v. Ameridebt*, 343 F. Supp. 2d 451, 462 (D. Md. 2004); *CFTC v. IBS, Inc.*, 113 F. Supp. 2d 830, 849 (W.D.N.C. 2000); *FTC v. U.S. Oil &*

47

*Gas Corp.*, 1987 U.S. Dist. Lexis 16137 (S.D. Fla. July 10, 1987).

31.   In this case, the corporate Contempt Defendants shared office space, managers, employees, human resources, accounting, and IT support.  The funds of RLG, ALG, and TFG were commingled, as D'Antonio moved money freely between corporate accounts and to his personal accounts.  D'Antonio also used various corporate accounts to accept payment from consumers and to pay employees.  The corporate Contempt Defendants worked together to market mortgage modification and foreclosure rescue services.  Most significantly, RLG, ALG, and TFG were under the common control of Bryan D'Antonio and his senior managers.

32.   The Contempt Defendants are jointly and severally liable as a common enterprise.  *J.K. Publications,* 99 F. Supp. 2d at 1202.  As a common enterprise, the corporate Contempt Defendants shared the actual knowledge of the Permanent Injunction with each other, and thus the actual notice of any corporate Contempt Defendant is imputed to each of the corporate Contempt Defendants.

**II.      Contempt Defendants Violated a Definite and Specific Court Order.**

A.   <u>The Permanent Injunction is Definite and Specific.</u>

33.   The relevant provisions of the Permanent Injunction – the telemarketing definition (in "Definitions"), Section I ("Permanent Ban") and Section II ("Prohibited Representations") are definite and specific.

1.   *The Telemarketing Ban Is Definite and Specific.*

34.   Section I.B. of the Permanent Injunction bans

48

1  D'Antonio, and those in active concert with him, from:

2          engaging in, or receiving any remuneration of

3          any kind whatsoever from, holding any

4          ownership interest, share, or stock in, or

5          serving as an officer, director, trustee,

6          general manager of, or consultant or advisor

7          to, any business entity engaged, or assisting

8          others engaged in any of these activities, in

9          whole or in part, in . . . [t]elemarketing or

10         assisting others engaged in telemarketing.

11 (Doc. 74 at 5-6.)

12         35.  The Permanent Injunction defines the term

13 "telemarketing" as "[a] plan, program or campaign which is

14 conducted to induce the purchase of goods or services by the use

15 of one or more telephones and which involves more than one

16 interstate telephone call."  (*Id.* at 4.)  The Contempt

17 Defendants' practice of marketing and selling their mortgage loan

18 modification and foreclosure rescue services ("to induce the

19 purchase of . . . services") during thousands of interstate

20 telephone calls that were initiated by consumers in response to

21 Contempt Defendants' Internet and radio advertising (the "plan,

22 program or campaign") fits within this definition of

23 telemarketing and is prohibited by the Permanent Injunction.

24         36.  "Telemarketing" does not mean, nor could it be

25 understood to mean, only outbound telephone sales calls to

26 persons with whom the callers have no prior relationship (*i.e.*

27 "cold-call" telemarketing).  There is no such limitation in the

28 definition.  The definition of "telemarketing" and the injunctive

prohibition against it in the 2001 Order are not vague, but clear and unambiguous on their face.

37.   The Court need not look beyond the four corners of the Order to determine its scope when the provisions are clear on their face.  *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S. Ct. 2576, 2585, 81 L. Ed. 2d 483 (1984) ("the 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it'") (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681-82, 91 S. Ct. 1752, 1757-58 (1971)); *Stone*, 968 F.2d at 861.

38.   Telemarketing is sufficiently defined by the Order, without reference to any outside source, to include all campaigns that use telephones and interstate telephone calls to complete sales.  The definition describes Contempt Defendants' telephone sales operations.  There is no need to look beyond the Order to consider D'Antonio's interpretation of the Order.

39.   To look outside the four corners of the Permanent Injunction to either the circumstances under which the Permanent Injunction was entered or the common understanding of the term "telemarketing" does not help D'Antonio.  In the original action against D'Antonio, the Commission alleged that defendants used general media advertisements to generate inbound telemarketing calls and then made deceptive representations during their telemarketing operations.  D'Antonio admitted to these inbound telemarketing practices by pleading guilty to an indictment alleging the same facts.  The telemarketing ban stemming from his inbound telemarketing scheme was designed — at a minimum — to

1  prohibit future, similar, inbound telemarketing. Thus,

2  D'Antonio's argument, which is made through counsel and without

3  sworn testimony, that he did not understand the ban to apply to

4  inbound telemarketing is not credible.

5        40.   The American Heritage Dictionary defines

6  "telemarketing" as "the business or practice of marketing goods

7  or services by telephone." (4th Ed. 2009.)  This definition is

8  consistent with that in the Permanent Injunction and covers the

9  Contempt Defendants' inbound telemarketing program.  D'Antonio's

10  reliance on the FTC's Telemarketing Sales Rule, 16 CFR Part 310

11  ("TSR"), does not support excluding inbound telemarketing from

12  the scope of the Preliminary Injunction.  The original, and still

13  primary, purpose of the TSR, as set forth in the authorizing

14  legislation, is to prevent telemarketing fraud, not to stop

15  irritating cold call telemarketing.[5]  The TSR's definitions of

16  "telemarketing" and "telemarketer" ("any person who, in

17  connection with telemarketing, initiates or receives telephone

18  calls to or from a customer or donor") describe the Contempt

19  Defendants' telephone sales operation.  16 C.F.R. §§ 310.2 (bb)

20

21        [5] *See* Telemarketing & Consumer Fraud & Abuse Prevention Act,
22  15 U.S.C. § 6101:  (1) Telemarketing differs from other sales
    activities in that it can be carried out by sellers across State
23  lines without direct contact with the consumer.  Telemarketers
    also can be very mobile, easily moving from State to State.  (2)
24  Interstate telemarketing fraud has become a problem of such
    magnitude that the resources of the Federal Trade Commission are
25  not sufficient to ensure adequate consumer protection from such
    fraud.  (3) Consumers and others are estimated to lose $40
26  billion a year in telemarketing fraud.  (4) Consumers are
    victimized by other forms of telemarketing deception and abuse.
27  (5) Consequently, Congress should enact legislation that will
    offer consumers necessary protection from telemarketing deception
28  and abuse.

1  and (cc).

2       41.   D'Antonio suggests, through counsel, that he read

3  the definition of telemarketing to incorporate certain exceptions

4  in the TSR to its general requirements.   However, the Commission

5  may seek broader remedies against individuals whom it sues in

6  Federal Court for engaging in deceptive, inbound telemarketing,

7  and the Court may proscribe a defendant's future conduct in

8  consideration of his past conduct.   *See FTC v. J.K. Publications*,

9  99 F. Supp. 2d at 1176.   Even had D'Antonio supplied evidence

10 that he subjectively understood the definition of "telemarketing"

11 in the Permanent Injunction to incorporate the TSR's exceptions,

12 this understanding would not be reasonable given the clarity of

13 the definition, the totality of the circumstances, and the common

14 meaning of the term.

15      42.   D'Antonio contends that he reasonably believed

16 the Permanent Injunction prohibited "telemarketing" when selling

17 "business ventures" because both bans are in the same section of

18 the Permanent Injunction, separated by the word "and."   This

19 narrow reading of the Permanent Injunction would ignore the

20 definitions section, which states that "[t]he terms 'and' and

21 'or' have both conjunctive and disjunctive meanings."[6]   Most

22 importantly,  D'Antonio offered no evidence concerning his

23 understanding of the Permanent Injunction, choosing instead to

24 remain silent.

25

26      [6] D'Antonio's counsel suggests that D'Antonio was not
   sophisticated enough to incorporate this definition.   This
27 purported lack of sophistication is inconsistent with the claim
   that he based his understanding on Federal Register notices
28 related to the FTC's 2004 do-not-call amendments to the TSR.

43.  D'Antonio also argues that it would be impracticable for him to know whether inbound telemarketing calls were interstate.  Given Contempt Defendants' national advertising and nationwide distribution of customers, the argument lacks merit.

2.  *The Prohibition on Misrepresenting Material Facts Is Clear and Definite.*

44.  Section II of the Permanent Injunction prohibits D'Antonio, and those in active concert with him, from misrepresenting, "in connection with the advertising, marketing, promoting, telemarketing, offering for sale, or sale of any good or service, . . . any fact material to a consumer's decision to buy or accept the good or service."  (Doc. 74 at 8-9.)

45.  The Permanent Injunction provides "fair and well-defined notice" that telemarketing and making material misrepresentations are prohibited.  *See Reno Air Racing Assoc., Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006).

B.  The FTC Established by Clear and Convincing Evidence That Contempt Defendants Violated the Permanent Injunction's Prohibition Against Telemarketing.

46.  There is clear and convincing evidence that Contempt Defendants violated the Permanent Injunction's telemarketing ban.  Contempt Defendants' operation was based on a concerted telemarketing campaign.  Contempt Defendants devoted significant resources to their nationwide radio advertising, which, along with their websites, directed consumers to call a toll-free telephone number.  Thereafter, Contempt Defendants'

53

1  dozens of telemarketers fielded thousands of consumer calls and

2  made false promises of modified mortgage loans with lower

3  interest rates and substantially reduced monthly payments.  The

4  telemarketers used scripted sales pitches and "rebuttal" scripts

5  to induce consumers to purchase the Contempt Defendants' mortgage

6  loan modification and foreclosure rescue services.  D'Antonio,

7  TFG, RLG, and ALG all participated directly in the telemarketing

8  campaign.  Therefore, Contempt Defendants violated the Permanent

9  Injunction by engaging in telemarketing.

10       C.   The FTC Has Established by Clear and Convincing

11            Evidence That Contempt Defendants Violated the

12            Permanent Injunction's Prohibition Against Making

13            Material Misrepresentations.

14       47.   There is clear and convincing evidence that

15  Contempt Defendants violated the Permanent Injunction's ban

16  against making material misrepresentations.  Contempt Defendants

17  made numerous material misrepresentations to market and sell

18  foreclosure prevention and mortgage loan modification services.

19  Specifically, Contempt Defendants falsely represented to

20  consumers that:  (1) none of their clients had ever lost a home

21  to foreclosure; (2) consumers would receive mortgage loan

22  modifications with substantially reduced interest rates, reduced

23  principal balances, and substantially reduced and affordable

24  monthly payments; and, (3) highly experienced attorneys would

25  fight for them in ways that included conducting "forensic audits"

26  that would compel lenders to offer affordable mortgage terms.

27  //

28  //

1.   *Contempt Defendants Misrepresented the Nature*
*of the Services Provided, Their History of*
*Success, and the High Likelihood That*
*Contempt Defendants Would Negotiate a*
*Substantially Reduced Mortgage Payment.*

48.   Contempt Defendants misrepresented that they employed multiple attorneys with foreclosure prevention and loan modification expertise and had never lost a home to foreclosure.

Contempt Defendants did not employ the number of attorneys promised, or attorneys with the promised qualifications.  Contempt Defendants did not have ten to twelve years of experience successfully negotiating reduced mortgage modifications.  Neither RLG nor ALG conducted forensic audits, pursued legal action against lenders, or, in most instances, even negotiated with lenders' legal departments.

49.   Although Contempt Defendants were sometimes successful in delaying foreclosure sales for their clients, a significant number of Contempt Defendants' customers lost their homes to foreclosure.

50.   Contempt Defendants made express and implied representations to consumers that they would successfully reduce consumers' monthly mortgage rates by negotiating with their lenders to drastically reduce interest rates and principal balances.  Contempt Defendants, in their national radio advertisements, Internet website, and telemarketing pitches, told consumers that they routinely obtained lower interest rates, lower monthly payments, and reduced principal balances.  Once consumers called the toll-free number, Contempt Defendants'

1  telemarketers repeated these claims, frequently asserting a 90%

2  or 100% success rate over a ten to twelve year history of

3  successful modifications for their clients.

4       The Contempt Defendants did not "routinely" negotiate

5  reduced interest rates for its clients nor have a success rate of

6  90% or 100%.  Even accepting the Contempt Defendants' contention

7  of 100 successful loan modifications for more than 2,000 clients,

8  the result is less than five percent.  The Receiver, after having

9  reviewed the case files and corresponding computer files for each

10 of the clients identified by Rodis and Chavarela as a successful

11 modification, could substantiate only eight files wherein the

12 borrower had been offered and accepted a mortgage loan

13 modification by their lender.

14      51.  ALG admitted that it did not successfully modify

15 any mortgage loans.

16      52.  The FTC found one successful modification in its

17 random survey of 49 RLG clients who first contacted RLG at least

18 three months before May 28, 2009.  This is not "routine" success.

19 Contempt Defendants' advertising and marketing claims of routine

20 success, and their frequent claims of 90 % or 100% success over

21 10 to 12 years of operation, were false.

22      53.  Contempt Defendants' express claims to consumers

23 that they would only take them on as clients if they could

24 dramatically reduce their mortgage payments were false.

25      54.  Contempt Defendants' telemarketers, relying on

26 scripts provided by Contempt Defendants, misrepresented the

27 extensive experience and uniform success of the attorneys that

28 would be working for them, and they made repeated express and

implied misrepresentations to consumers that they would, in fact, obtain a significant mortgage payment reduction for them in a relatively short period of time.  In many instances, Contempt Defendants' telemarketers told consumers that they would be better off paying for Contempt Defendants' services than continuing to make mortgage payments because Contempt Defendants had never lost a home to foreclosure and because of the inevitable and substantial reduction in payment that their attorneys would negotiate for the consumer.

55.  The content of RLG's and ALG's websites, radio advertisements, sales scripts, and other marketing materials were virtually identical, and telemarketers for both entities made the same misrepresentations.  When RLG stopped accepting new clients, its telemarketers became telemarketers of the foreclosure and loan modification services under ALG's name.  RLG and ALG both misrepresented that they would conduct forensic audits and aggressively negotiate on consumers' behalf, and both relied on the same deceptive customer "testimonial."  ALG continued to use RLG's telemarketing scripts, including misrepresentations that it had a long history of success in negotiating substantially reduced mortgage payments and misrepresentations that it would successfully negotiate a substantially reduced mortgage payment for all of its customers.

56.  ALG continued RLG's misrepresentations that it had ten to twelve years of experience.  ALG also falsely touted its successful representation of over 2,000 homeowners in an April 16, 2009 press release , even though it had a total of only 408 clients as of May 28, 2009, and had not successfully obtained a

1   loan modification for any of its clients.

2             2.   *Contempt Defendants' Misrepresentations Were*

3                 *Material.*

4       57.   Contempt Defendants' misrepresentations to

5   potential customers about the nature of the services they would

6   provide, the experience of their lawyers, their history of

7   success in preventing foreclosure and negotiating a mortgage

8   modification, and the extremely high likelihood that they could

9   negotiate substantial reductions in mortgage loan payments were

10   false and deceptive. *See FTC v. Cyberspace.com, LLC*, 453 F.3d

11   1196, 1199 (9th Cir. 2006) (a practice is deceptive "(1) if it is

12   likely to mislead consumers acting reasonably under the

13   circumstances (2) in a way that is material.") These

14   misrepresentations were clearly material to consumers' decisions

15   to purchase services from Contempt Defendants. *FTC v. Five-Star*

16   *Auto Club, Inc.*, 97 F.Supp. 2d 502, 528 (S.D.N.Y. 2000) (internal

17   citations omitted) ("'Consumer reliance on express claims is []

18   presumptively reasonable. . . . It is reasonable to interpret

19   express statements as intending to say exactly what they say.'")

20   Therefore, Contempt Defendants made material misrepresentations

21   in violation of the Permanent Injunction.

22             3.   *Contempt Defendants' Disclaimers Did Not*

23                 *Change the Net Impression of the*

24                 *Misrepresentations.*

25       58.   Starting sometime in February 2009, Contempt

26   Defendants began to provide consumers with a verbal and written

27   disclaimer that results were not "guaranteed." However, these

28   disclosures were given only after consumers heard or saw Contempt

Defendants' deceptive advertising, and after Contempt Defendants'
telemarketers made repeated false claims about the nature of the
services they would provide, the experience of their lawyers,
their history of success in preventing foreclosure and
negotiating a mortgage modification, and the great likelihood
that they could negotiate substantial reductions in mortgage loan
payments.  Scripts used by Contempt Defendants prompted the
telemarketers to repeat and stress the deceptive claims about
history of success and the high likelihood that they would
negotiate a substantial reduction in mortgage loan payments even
while answering consumers' questions about the "no guarantee"
policy.  The false promises overshadowed the disclaimers;
consequently, the disclaimers did not alter the "net impression"
conveyed by Contempt Defendants' misrepresentations.  *See
Cyberspace.com, LLC*, 453 F.3d at 1200 ("net impression"
representation misleading even if it also contains truthful
disclosures); *FTC v. Medlab, Inc.*, No. C 08-822 SI, slip op. at
7-8 (N.D. Cal. April 21, 2009) (parties cannot "innoculate
themselves" from net impression with cautionary statements); *FTC
v. Vocational Guides, Inc.*, 2009 WL 943486, *16, ¶¶ 25-27 (M.D.
Tenn. April 6, 2009) (disclaimer did not change the net
impression because "[t]he 'no guarantee' *caveat* in the script was
buried in a series of upbeat pronouncements about the easy
availability of grant money.")

                    4.   *Evidentiary Objections are Overruled in Part
and Sustained in Part.*

        59.  D'Antonio objects that consumer testimony about
the telephone conversations that those consumers had with

Contempt Defendants' telemarketers is inadmissible hearsay.  For the most part, these statements recount the sales pitches made by Contempt Defendants' telemarketers to these consumers.  These statements are not hearsay because the FTC is not introducing them for the truth of the matter asserted, but rather to show that the statements were made.  *United States v. Gibson*, 690 F.2d 697, 700 (9th Cir. 1982) ("The investor's testimony was offered to prove the existence of a scheme; the statements were not offered for their truthfulness.  The purpose of the testimony was solely to establish the fact that the salesmen and employees had made the statements.")  In those instances where the testimony about the conversation is offered for the truth of the matter asserted, and is therefore hearsay, it is still admissible as a statement of an agent for a party pursuant to Fed. R. Evid. 801(d)(2)(D).

The Temporary Receiver's Report is hearsay insofar as the Court is asked to make factual findings based on the various conclusions drawn by the Receiver as to how the entities were operated (pages 3 through 14), and D'Antonio's objections thereto are sustained.  However, certain facts referred to therein stand uncontroverted, e. g., the amounts of revenue and refunds based on the companies' books and records, and have been relied on by all parties in their arguments and proposed findings of fact and conclusions of law, and, are, therefore, accepted as correct for these proceedings.  In addition, the Report has attached to it numerous exhibits, particularly office e-mails, that disclose how D'Antonio and his associates operated the Contempt Defendant entities.  D'Antonio's objections to the communications found by

1   the Receiver, or communications made directly to the Receiver,

2   whether in attachments or in pages 3 through 14, are overruled.

3        The remaining parties' objections on foundation and

4   hearsay grounds as to numerous declarations submitted by

5   plaintiff as well as Contempt Defendants are overruled.  The

6   Court's findings are based on those facts found to be reliable

7   and admissible.

8        D.   The Contempt Defendants Did Not Substantially

9             Comply with the Permanent Injunction.

10       60.  Contempt Defendants D'Antonio and RLG argue that

11  they were in substantial compliance with the Permanent Injunction

12  based upon a "good faith and reasonable interpretation of the

13  order."  *In re Dual-Deck Video Cassette Recorder Antitrust*

14  *Litigation*, 10 F.3d 693, 695 (9th Cir. 1993) ("'Substantial

15  compliance' with the court order is a defense to civil contempt,

16  and is not vitiated by 'a few technical violations' where every

17  reasonable effort has been made to comply.")

18       The FTC has proven, by clear and convincing evidence,

19  that the Contempt Defendants' violations of the Permanent

20  Injunction were substantive and that Contempt Defendants did not

21  make reasonable efforts to comply.

22       61.  Contempt Defendant D'Antonio's purported

23  understanding that the Permanent Injunction's telemarketing

24  prohibition did not apply to Contempt Defendants' telephone

25  marketing campaign is neither in good faith nor reasonable.

26  Contempt Defendants have not proffered any alternative "good

27  faith and reasonable" interpretation of the prohibition on

28  material misrepresentations.

62. Contempt Defendants' operation of a large-scale, nationwide telemarketing operation cannot be considered a "merely technical" violation of the prohibition against telemarketing. The Contempt Defendants' advertising and telemarketing were permeated with material misrepresentations. They operated a multi-million dollar telemarketing fraud to obtain substantial fees from desperate consumers who, concerned with losing their homes, ended up paying for services the Contempt Defendants did not deliver.

63. Contempt Defendants argue that they were in substantial compliance with the Permanent Injunction because they made good faith efforts to provide the promised services to their customers, focusing on purported improvements in the "legal department" starting in mid-April, 2009.

The Contempt Defendants continued to engage in telemarketing in violation of the Order until the Receiver took possession pursuant to the TRO on May 28, 2009. The Contempt Defendants also continued to make material misrepresentations in their national radio advertisements, on their website, in a press release, in telemarketing pitches to consumers, and in emails to potential clients until their marketing was stopped pursuant to the TRO on May 28, 2009.

The Contempt Defendants were well aware that they were inducing consumers to purchase their services by making material misrepresentations, yet continued to make these representations. There is no evidence that Contempt Defendants had obtained or could obtain the promised results for their new clients.

64. Although the Contempt Defendants made some

improvements to their practices, there is strong reason for the Court to question whether the changed practices, which started in mid-April – nearly six months after the first consumers started retaining Contempt Defendants' services – were voluntary. *See FTC v. Sage Seminars, Inc.*, No. C 95-2854 SBA, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2, 1995) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 n.5, 73 S. Ct. 894, 97 L.Ed. 1303 (1953) (acknowledging that courts should be skeptical of evidence of changed practices when the timing demonstrates anticipation of suit).

65.  Contempt Defendants point to consumer refunds of $1,483,469 (out of $12,116,252 in total customer payments) as evidence of substantial compliance.  Although many consumers received full or, more commonly, partial refunds, many consumers found it difficult or impossible to obtain refunds.  Furthermore, the argument that providing refunds somehow makes the falsity of an ad irrelevant "has been repeatedly rejected." *FTC v. Think Achievement*, 312 F.3d 259, 261 (7th Cir. 2002) ("No one would buy something knowing it was worthless and that therefore he would get a refund of his purchase price."); *Cyberspace.com*, 453 F.3d at 1201-1202 ("Similarly, the fact that companies provided consumers a toll free number to call for refunds does not affect our conclusion that the solicitation" was deceptive); *FTC v. Pantron*, 33 F.3d 1088, 1103 (9th Cir. 1994) ("the existence of a money-back guarantee is insufficient reason as a matter of law to preclude a monetary remedy."); *Vocational Guides, Inc.*, 2009 WL 943486, at *16, ¶¶ 28 - 29 (rejecting defense that contemnors did not violate prohibition against material misrepresentations

1    because refunds provided.)

2    **III.**       **Contempt Defendants Face Sanctions to be Determined**

3            66.   Courts have the authority to impose sanctions for

4    violations of their orders, including coercing compliance with

5    the order, requiring compensation for losses sustained as a

6    result of failure to comply with the order, or both. *United*

7    *States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04

8    (1947); *Koninklijke Philips Elec. N.V. v. KXD Tech., Inc.*, 539

9    F.3d 1039, 1042 (9th Cir. 2008) (purpose of civil contempt is

10    coercive or compensatory).

11                          **IV.**

12                    <u>**CONCLUSION**</u>

13            In accordance with the foregoing, the Court finds and

14    concludes that all Contempt Defendants are in contempt of the

15    Court's Permanent Injunction issued July 13, 2001.

16            A Phase II hearing to determine appropriate sanctions

17    and to adjudicate the FTC's Ex Parte Motion to Modify the

18    Permanent Injunction shall be held on March 1, 2010, at 2:00 p.m.

19    A separate minute order sets the briefing schedule.

20            IT IS SO ORDERED.

21            The Clerk shall serve this Order on all counsel

22    involved with the Order to Show Cause re Contempt.

23            DATED:    January 15, 2010.

24                          ALICEMARIE H. STOTLER
                                        _____

25                             ALICEMARIE H. STOTLER
                         UNITED STATES DISTRICT JUDGE

26

27

28